1  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
   Marcus S. Topel (State Bar No. 54702)
2  mtopel@kasowitz.com
   Daniel F. Cook (State Bar No. 70484)
3  dcook@kasowitz.com
   101 California Street, Suite 2300
4  San Francisco, CA 94111
   Telephone:  (415) 421-6140
5  Facsimile:  (415) 398-5030
6
7  Counsel for Defendant
   SKYLER CHANG
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12

13  UNITED STATES OF AMERICA,          Case No:  CR-11-0097 CRB (JCS)

14        Plaintiff,                   **NOTICE OF MOTION AND MOTION BY
                                       DEFENDANTS SKYLER CHANG, CUONG
15    vs.                              TIEU, DING LIN, LAP THE CHUNG, BOB
                                       YUEN, KWAI PING WONG, HUNG TIEU,
16  CUONG MACH BINH TIEU; SKYLER       JOHN CHEW, AND MAY CHUNG FOR
    CHANG et al.,                      DISCLOSURE OF IDENTITY AND
17                                     INFORMATION RE INFORMANTS AND
        Defendants.                    COOPERATING WITNESSES;
18                                     MEMORANDUM IN SUPPORT OF
                                       MOTION**
19

20                                     DATE:     November 9, 2011
                                       Time:     2:15 p.m.
21                                     Courtroom:  6, 17th Floor
                                       Judge:    Hon. Charles R. Breyer
22

23

24                         **NOTICE OF MOTION**

25  TO:   THE UNITED STATES OF AMERICA, PLAINTIFF AND AARON WEGNER,
          ASSISTANT UNITED STATES ATTORNEY, COUNSEL FOR PLAINTIFF
26

27        Please take notice that on the above date, time and place, before the Honorable Charles R.

28  Breyer, United States District Judge, the moving defendants, by and through their counsel, will

                                       1

and hereby move this Court for an order directing the government to provide discovery regarding the identity of, and information about, informants and cooperating witnesses, as set forth in the Motion set forth below.  This Motion is based upon the Fifth and Sixth Amendments to the United States Constitution, Rules 12 and 16 of the Federal Rules of Criminal Procedure, this Court's inherent and supervisory powers over discovery matters, this Court's files and records in this case, the Memorandum in Support of Motion, and such further evidence or argument that may be presented at the hearing on this Motion.

Defendants' Mot to Disclose Informants                                    Case No. CR-11-0097 CRB (JCS)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**MOTION**

The defendants move for the following discovery:

1. The full identity of every confidential informant or cooperating witness [hereinafter "the informant"] involved in the charges against the defendants;

2. The present location, address, and phone number of the informant, or some method by which a defense investigator can interview him;

3. Any information regarding any payments, whether moiety, expense, or otherwise, made to the informant, including but not limited to copies of any pay sheets, payment requests, and vouchers in this or other cases;

4. Any information regarding monies or expenses and any rewards paid to the informant pursuant to 28 U.S.C. § 524(c)(1)(B), (C), or paid pursuant to state authority, in this or other cases;

5. Any information regarding any payments, whether moiety, expense, or otherwise, made to the friends or family of the informant in relation to his or her work as a confidential source in this or other cases;

6. Any information or instructions given to the informant regarding his or her obligation to pay taxes on money provided by the government;

7. Copies of any written agreements that the informant entered into concerning his or her status and work as an informant or cooperating witness or source;

8. Any information calling into question the credibility of the informant and the details of any instances in which the informant in this case has been discovered to have been untruthful or dishonest, including but not limited to cross-examination of the informant, instances in which a warrant based on the statements of the informant was not issued, and other facts that have come to the government's attention regarding the credibility of the informant;

9. All debriefing reports from the informant;

10. Any instructions given to the informant regarding entrapment;

11. All information regarding any expectations that the informant may have at sentencing, if

1

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1     any potential sentence is pending;

2    12.    All information regarding any promises of immunity, leniency, or preferential treatment

3     to the informant in this or any other case;

4    13.    All information or records of actual or implied threats – such as criminal investigation,

5     prosecution, deportation, or exclusion – made by the government to the informant or the

6     informant's family or friends;

7    14.    All copies of any Presentence Reports or state probation reports regarding the informant;

8    15.    All information regarding the informant's prior bad acts, including all records of arrests

9     and convictions, and of activities which law enforcement officials investigated but did

10     not prosecute;

11    16.    All information or records regarding intervention by federal or state law enforcement

12     authorities to state regulatory agencies on behalf of the informant;

13    17.    All information regarding the seizure or threatened seizure of the informant's assets;

14    18.    All information regarding any polygraph examination of the informant, the results of

15     those examinations, and questions asked during all polygraph examinations;

16    19.    All information regarding any mental impairment of the informant;

17    20.    All information regarding narcotic or alcohol dependency for the informant, including

18     any occasions when law enforcement officers have observed the informant under the

19     influence of a controlled substance;

20    21.    All statements of the informant, including but not limited to his or her:

21     a.    Statements upon initial arrest;

22     b.    Statements during interviews by pre-trial services;

23     c.    Statements at his or her initial appearance;

24     d.    Statements made in a proffer by his or her counsel to the government;

25     e.    Statements made during interviews by case agents or law enforcement personnel;

26     f.    Statements made during interviews by any Assistant United States Attorney or

27     Assistant District Attorney;

28     g.    Statements made during testimony before a grand jury;

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

2

h.    Statements made at any plea colloquy;

i.    Statements made during later interviews with case agents;

j.    Statements made during any presentence report interview with probation;

k.    Statements made during pre-trial preparation in the present case.

22.   The rough notes of government agents or police officers made in relation to any informant's statements requested in item number 21.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

3

# TABLE OF CONTENTS

**Page(s)**

MEMORANDUM IN SUPPORT OF MOTION ................................................................ 1

STATEMENT OF FACTS ............................................................................................... 1

   1.  CS1, CS2, CS4 and CS5 ........................................................................................ 1

   2.  CS3 ........................................................................................................................ 6

      a.  Ding Lin .......................................................................................................... 6

      b.  Lap The Chung ............................................................................................... 7

      c.  Bob Yuen ...................................................................................................... 11

      d.  Kwai Ping Wong and Hung Tieu ................................................................. 11

          1)  Facts Regarding January 14, 2010 ....................................................... 12

          2)  Facts Regarding February 1, 2010 ....................................................... 13

          3)  Facts Regarding February 4, 2010 ....................................................... 13

          4)  Facts Regarding June 3, 2010 .............................................................. 14

          5)  Facts Regarding June 23, 2010 ............................................................ 14

      e.  John Chew .................................................................................................... 14

          1)  Facts Regarding February 1, 2010 ....................................................... 15

          2)  Facts Regarding August 3, 2010 .......................................................... 15

      f.  May Chung .................................................................................................. 15

   3.  CS6 ...................................................................................................................... 16

   4.  CHAS-S-00031617 (Sek Fook, Mui Tou) .......................................................... 17

   5.  Redacted Name In Master Search Warrant Affidavit And Indictment ............... 17

ARGUMENT ................................................................................................................. 17

   I.  COURT SHOULD ORDER DISCLOSURE OF THE INFORMANTS'
      IDENTITIES ....................................................................................................... 18

      A.  *Rovario* Balancing Test Favors Disclosure Of Identifying Information ................ 19

         1.  No safety concerns weigh against disclosure ................................................ 19

         2.  The crime charged does not allege violence by the defendants ......................... 20

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

    

3. The information is necessary for the defendants' defense .................................. 20

4. Other relevant factors support disclosure .......................................... 21

B. Disclosure Of Informant Location And Communications Also Required ............... 21

II. THIS COURT SHOULD ORDER DISCLOSURE OF FAVORABLE MATERIAL PERTAINING TO INFORMANT'S CREDIBILITY ...................................................... 22

CONCLUSION .......................................................................................... 24

K A S O W I T Z ,  B E N S O N ,  T O R R E S  &  F R I E D M A N  L L P

101 CALIFORNIA STREET, SUITE 2300

SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                    Case No. CR-11-0097 CRB (JCS)

# TABLE OF CASES AND AUTHORITIES

**Page(s)**

## CASES

*Brady v. Maryland*
  373 U.S. 83 (1963) ..................................................................................... 22, 23, 24

*Gantt v. Roe*
  389 F.3d 908 (9th Cir. 1993) ................................................................................ 24

*Giglio v. United States*
  405 U.S. 150 (1972) ......................................................................................... 22-23

*Kyles v. Whitley*
  514 U.S. 419 (1995) ......................................................................................... 23-24

*McLawhorn v. State of North Carolina*
  484 F.2d 1 (4th Cir. 1973) ................................................................................... 21

*Roviaro v. United States*
  353 U.S. 53 (1957) ..................................................................................... passim

*Singh v. Prunty*
  142 F.3d 1157 (9th Cir. 1998) .............................................................................. 23

*United States v. Amador-Galvan*
  9 F.3d 1414 (9th Cir. 1993) ................................................................................. 19

*United States v. Blanco*
  392 F.3d 382 (9th Cir. 2004) ............................................................................... 24

*United States v. Bonilla*
  615 F.2d 1262 (9th Cir. 1980) .............................................................................. 18

*United States v. Clegg*
  740 F.2d 16 (9th Cir. 1984) ................................................................................. 23

*United States v. Davenport*
  753 F.2d 1460 (9th Cir. 1985) .............................................................................. 24

*United States v. Hart*
  546 F.2d 798 (9th Cir. 1976) (*en banc*) ............................................................... 22

*United States v. Hernandez*
  608 F.2d 741 (9th Cir. 1979) ............................................................................... 21

*United States v. LaRizza*
  72 F.3d 775 (9th Cir. 1995) ................................................................................. 22

*United States v. Mandel*
  914 F.2d 1215 (9th Cir. 1990) .............................................................................. 23

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                    Case No. CR-11-0097 CRB (JCS)

*United States v. Miller*
  529 F.2d 1125 (9th Cir. 1976)...................................................................................... 22

*United States v. Montgomery*
  998 F.2d 1468 (9th Cir. 1993)...................................................................................... 22

*United States v. Ordonez*
  737 F.2d 793 (9th Cir. 1983)........................................................................................ 20

*United States v. Sai Keung Wong*
  886 F.2d 252 (9th Cir. 1989)........................................................................................ 19

*United States v. Shaffer*
  789 F.2d 682 (9th Cir. 1986)........................................................................................ 23

*United States v. Van Brandy*
  726 F.2d 548 (9th Cir. 1984)........................................................................................ 23

*United States v. Williams*
  2010 WL 3447704 (N.D. Cal., Aug. 30, 2010).................................................... 18, 21

*Weatherford v. Bursey*
  429 U.S. 545 (1997)...................................................................................................... 24

## **RULES**

F.R. Crim. P. Rule 16................................................................................................... 23

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                    Case No. CR-11-0097 CRB (JCS)

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**MEMORANDUM IN SUPPORT OF MOTION**

Defendants Skyler Chang, Cuong Tieu, Ding Lin, Lap The Chung, Bob Yuen, Kwai Ping Wong, Hung Tieu, John Chew, and May Chung seek an order to compel the government to disclose information regarding the identity of and information about confidential informants and cooperating witnesses (hereinafter "informants") involved in the case against them. The government has refused the defendants' informal request for disclosure of informant identity and informant information. Each of the informants for which this information is sought was a percipient witness to the offenses charged in the indictment. Each of the informants has some sort of agreement with the government for their cooperation. The government has refused the defendants' informal request for disclosure of such *Brady/Giglio* information about the informants, stating only that it would produce such information only shortly before trial. Under the facts and relevant case law discussed below, this Court should order disclosure of the identity of the informants, percipient witnesses to offenses charged in the indictment, and information about the informants sought by this motion.

**STATEMENT OF FACTS[1]**

This motion seeks disclosure of the identity of six informants – CS1, CS2, CS3, CS4, CS5, and CS6 and other cooperating witnesses. As to all defendants charged in the two RICO counts (Counts 1 and 2), the identity of any informant who would provide information in regards to any one of the defendants charged in the RICO counts, that could be used by the government to prove either RICO charge, is relevant to the other RICO-charged defendants as either alleged co-conspirator acts or statements.

The following is a summary of the evidence showing that each informant was a percipient witness to offenses charged in the indictment.

**1.   CS1, CS2, CS4, and CS5**

CS1 and CS2 were percipient witnesses to the alleged one pound methamphetamine deal

---

[1]   The facts presented in this statement are based on the indictment, the master search warrant affidavit in this case [BN CAS002110-70], affidavits in support of wiretap applications, and discovery provided by the government to date. The defendants do not concede the truthfulness of the government's allegations or the facts contained herein.

Defendants' Mot to Disclose Informants                                    Case No. CR-11-0097 CRB (JCS)

1  charged in Counts 3 and 4.  As alleged in the master affidavit for search warrants on various

2  residences:

A.  TIEU and CHANG Conspire to Possess with Intent to Distribute One Pound
    of Methamphetamine Through Artichoke Joe's

21.  Between in or about February 2008 and in or about April 2008, Cuong
     Mach Binh TIEU and Skyler CHANG conspired to possess with intent
     to distribute one pound of a mixture or substance containing
     methamphetamine utilizing, in part, the premises of Artichoke Joe's to
     facilitate the deal as set forth in more detail below. [3]  Based on the
     events described below, on February 24, 2011, the Grand Jury for the
     Northern District of California returned an indictment charging TIEU
     and CHANG with one count of Conspiracy to Possess with the Intent to
     Distribute and to Distribute Methamphetamine and one count of
     Possession with the Intent to Distribute and Distribution of
     Methamphetamine.

   3.  A historical DEA investigation established that a group of individuals were
       running a lucrative "triangle trade" of narcotics out of the Bay Area up
       through 2007 and early 2008.  Money from the Bay Area would be used to
       purchase kilo quantities of cocaine in Southern California that would then be
       transported in secret vehicle compartments to British Columbia, Canada
       where it would be traded for ecstasy.  The ecstasy was then distributed
       throughout the Bay Area through an Asian organized crime network that
       ultimately proved to have deep ties to Oaks Card Club and Artichoke Joe's
       Casino.  A DEA confidential source ("CS1"), one of the participants in the
       "triangle trade" of drugs described above, was caught with a significant
       quantity of ecstasy and agreed to cooperate with the United States to ferret out
       any and all narcotics trafficking engaged in by this group.

22.  On February 6, 2008, a DEA confidential source ("CS1") [4] drove a DEA
     confidential source (CS2") [5] (CS2 was not cooperating with the
     government at this time) to Artichoke Joe's to meet with Skyler
     CHANG and obtain a sample of methamphetamine to conduct a purity
     sample of the drug.  CS1 and CS2 obtained the methamphetamine
     sample at that time.  CHANG and CS2 went to CS1's residence on
     February 7, 2008 to retest the methamphetamine sample, which they
     found to be of poor quality.  CHANG left with the methamphetamine
     sample.

   4.  In early 2007, CS1 was arrested in the District of Minnesota and charged with
       possession of 10,000 tablets of ecstasy.  CS1 agreed to cooperate with the
       government and pled guilty to the charges. In October 2008, CS1 was
       sentenced to five years of probation as a result of his conviction.  CS1's
       information has been corroborated in the past.

   5.  On July 2, 2008, CS2 was arrested in the Northern District of California and
       charged with conspiracy to possess with the intent to distribute 300,000 tablets
       of ecstasy.  Shortly after this arrest, CS2 agreed to cooperate with the
       government and pled guilty to the charges.  CS2 is currently awaiting
       sentencing.  CS2's information has been corroborated in the past.

23.  On February 21, 2008, surveillance observed CS2 meeting with an
     unidentified male at Artichoke Joe's Casino.  According to CS2, s/he

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

2

obtained another methamphetamine sample from the unidentified male at Artichoke Joe's at that time. CS2 later met with CS1 at a business called Motorcycle Madness in San Bruno, California, and provided CS1 with the methamphetamine sample.

24. A couple of months later, on April 22, 2008, CS1 received a call from CS2 informing him that CHANG was coming to meet CS1. Later that day, surveillance observed CHANG meet with CS2. According to CS2, CHANG provided CS2 with a methamphetamine sample during that meeting. Shortly thereafter, CS2 arrived at CS1's residence to delivered the methamphetamine sample provided by CHANG (later testing revealed the sample weighed 26.25 grams).

25. On April 24, 2008, CS1 set up a one pound methamphetamine deal through CS2. CS2 met with CHANG and while together, CHANG communicated with TIEU about obtaining methamphetamine, and CS2 communicated with CS1 to facilitate a meeting between CS1 and a runner for TIEU. The transaction eventually took place at Zesty's Vietnamese Restaurant in San Francisco, California, that evening while TIEU, CHANG, CS2, CS1 and others were present. In short, an associate of TIEU's gave the methamphetamine to CS1 in a parking lot near Zesty's while the others were inside. The following day, April 25, 2008, CS1 paid CHANG $18,500 for the one pound of methamphetamine delivered the night before.

CS4 and CS5 were percipient witnesses to charged acts against Cuong Tieu alone. As alleged in the master search warrant affidavit:

B. TIEU Conspires to Possess with Intent to Distribute 5 or More Kilograms of Cocaine

26. On March 29, 2010, an associate of TIEU (this individual became a DEA/FBI cooperating witness ("CS4")) was arrested for driving under the influence of alcohol by the California Highway Patrol near Hercules, California. Based on drug evidence found in CS4's car, state search warrants were obtained and executed at two addresses associated with CS4. As a result of those searches, and a follow-up consent search the next day, officers seized 13,029 tablets of ecstasy containing MDMA and Ketamine, 438 grams of cocaine, and two firearms. [6]

6. CS4 agreed to cooperate with the investigation within a few days after the arrest on March 29, 2010. CS4 later pled guilty to the following federal charges: 1) Conspiracy to Possess Ephedrine With Intent to Manufacture a Controlled Substance; 2) Conspiracy to Possess With Intent to Distribute, and To Distribute Cocaine in violation of 21 U.S.C. § 846; 3) Conspiracy To Possess With Intent To Distribute, and To Distribute MDMA in violation of 21 U.S.C. § 846; 4) Manufacture and Possession With Intent To Distribute Marijuana in violation of 21 U.S.C. § 841; and 5) Possession of an Unregistered NFA Firearm in violation of 26 U.S.C. § 5861(d). CS4 is currently awaiting sentencing. CS4's information has been corroborated in the past.

27. In subsequent interviews with agents, CS4 admitted that in February 2010, TIEU asked him to pick up $24,000 in cash from Oaks. CS4 later

Defendants' Mot to Disclose Informants                                    Case No. CR-11-0097 CRB (JCS)

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

picked up $24,000 from [redacted] at Oaks.  CS4 and TIEU later met with a cocaine source, who later became a government cooperating witness ("CS5"), [7] and purchased ¾ kilogram of cocaine for $11,000 (using the $24,000 picked up earlier from Oaks).  Shortly thereafter, TIEU instructed CS4 to seek a full refund or a $3,000 discount from CS5 because the cocaine was low quality.  The next day, CS4 met with CS5 and CS5 agreed to a $3,000 discount for the cocaine.

> 7.  On July 23, 2010, CS5 was arrested by federal agents in the Northern District of California while in possession of three kilograms of cocaine.  CS5 agreed to cooperate with the investigation within a few days after his arrest on July 23, 2010.  CS5 pled guilty to conspiracy to possess with intent to distribute, and to distribute five kilograms or more of cocaine.  CS5 is currently awaiting sentencing.  CS5's information has been corroborated in the past.

28.  A few days later, TIEU and CS4 met with CS5 again.  After the meeting, based on TIEU's directions, CS4 again used the funds obtained from [redacted] at Oaks to purchase another kilogram of cocaine from CS5.  CS4 then transported the cocaine to her/his home.  Later at home, CS4 divided up the kilogram into four separately packaged quarter kilograms.  Based on TIEU's instruction, CS4 delivered one quarter to a person in San Jose and another quarter to a woman he knew as "sister."  (The remaining cocaine, 438 grams, was recovered from CS4's home during the execution of the search warrant on March 29, 2010).  Later that day, TIEU called CS4 and told him/her to purchase another kilogram of cocaine from CS5 and to tell CS5 to deliver it to Dreams Auto Collision Center in Pinole, California.  CS5 later informed agents that s/he did in fact deliver one kilogram of cocaine to TIEU at Dreams Auto Collision Center.  Shortly after the delivery, TIEU instructed CS4 to return the kilogram of cocaine because it was poor quality.

29.  Based on the events described above, on February 24, 2011, the Grand Jury of the Northern District of California returned an indictment charging TIEU with one count of Conspiracy to Possess with the Intent to Distribute and to Distribute Cocaine.

CS1, CS2, and CS4 also were percipient witnesses to the alleged offenses relating to the listed chemical ephedrine offenses charged in Counts 5 through 8 of the indictment, as outlined and alleged in the master affidavit for search warrants on various residences:

C.  TIEU, CHANG, and LIN Conspire to Possess a Listed Chemical with Intent to Manufacture Methamphetamine Using Money from Oak's Kwei Tung

30.  Between in or about March 2009 and in or about November 2009, Cuong Mach Binh TIEU, Skyler CHANG, and Ding LIN conspired to possess and distribute ephedrine, a list I chemical, that was believed to be purchased with money from the "kwei tung" at Oaks Card Club, knowing and having reasonable cause to believe the ephedrine would be used to manufacture a controlled substance as set forth in more detail below.  Based on the events described below, on February 24, 2011, the Grand Jury of the Northern District of California returned an indictment charging TIEU, CHANG, and LIN with: 1) one count of Conspiracy to Unlawfully Possess and Distribute Ephedrine; 2) one count of Possession and

4

Distribution of Ephedrine; and 3) Conspiracy to Manufacture Methamphetamine.

a.  On January 9, 2008, CS1 had initial discussions with CS2 about Skyler CHANG's plan to import methamphetamine precursors into the United States.  According to CS2, CHANG's plan involved using Motorcycle Madness, a local motorcycle parts store, to import drug pre-cursors in motorcycle parts.  It is believed that CHANG flew to China on January 10, 2008, to look into the issue. This particular scheme never came to fruition.

b.  On March 11, 2009, CHANG met with CS2 (who had become a DEA confidential source) and an undercover DEA agent at Houston's restaurant in San Francisco, California, to discuss the purchase and delivery of ephedrine to CHANG.  When the undercover agent asked what the ephedrine was for, CHANG, pointed to a glass with ice cubes in it and taped it, signaling "ice," the street name for methamphetamine.  The discussion moved from using the undercover agent to transport precursors to having the undercover agent provide and transport the precursors himself.

c.  On April 4, 2008, CS2 met with CHANG to discuss the delivery of 25 kilos of ephedrine through the undercover DEA agent.

d.  On April 23, 2009, CS2 met with CHANG to provide him with a 5 gram sample of ephedrine.  CHANG did not take the sample at that time.  However, the following day, April 24, 2009, CS2 met with CHANG again to deliver the 5 gram sample of ephedrine.  This time CHANG did take the ephedrine sample.

e.  On May 13, 2009, CS2 met CHANG to discuss Cuong Mach Binh TIEU's payment for the ephedrine.  As a result of this discussion, on May 26, 2009, CHANG deposited $3,500 into an undercover bank account as a deposit for 25 kilograms of ephedrine.

f.  On June 6, 2009, CHANG provided CS2 with sample of three ecstasy tablets.  CHANG told CS2 that TIEU had made the sample with the ephedrine provided on April 23, 2009.

g.  On June 24, 2009, CS2 had a conversation with CHANG where CHANG told CS2 that TIEU took $30,000 from the "Kwei Tung" or drawer at Oaks Card Club to pay for the 25 kilos of ephedrine.

h.  On June 30, 2009, the controlled delivery of 25 kilograms of ephedrine occurred.  The ephedrine was broken down into three buckets containing approximately 8.3 kilograms each.  On that day, Skyler CHANG gave an FBI undercover agent $26,500 as payment for the ephedrine in Union City, California (the initial deposit of $3,500 having already been provided on May 26, 2009).  Around the same time, CS2 met with CS4 (prior to cooperation).  CS4 arrived at the transaction on a motorcycle and was only able to transport one of the three buckets of ephedrine.  CS2 was instructed by agents to keep possession of the other two buckets in a storage facility in San Mateo, California, until TIEU indicated that he was ready for them.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                    Case No. CR-11-0097 CRB (JCS)

i. On July 1, 2009, CS2 met with CHANG to discuss events of prior day. This meeting included a lengthy discussion about the delivery of the ephedrine along with CHANG informing CS2 that the money to pay for the ephedrine came from the "kwei Tung" (podium drawer) at Oaks Card Club.

j. By November 2009, CS2 was informed by CHANG that TIEU was prepared to take delivery of the second and third buckets of ephedrine that was being maintained by CS2. On November 9, 2009, agents observed TIEU and CHANG meeting with each other at a restaurant. The following day on November 10, 2009, CS2 met with CHANG who instructed CS2 to deliver the remaining ephedrine buckets to TIEU at LA Tech Auto Body in Richmond, California, before 5:00 p.m. CS2 delivered the two remaining buckets to CS4 at LA Tech Auto Body later that day. CS2 observed TIEU at LA Tech Auto Body during the delivery but did not speak to him.

k. CS4 later informed agents that s/he transported the remaining two ephedrine buckets to Wei Chou ZHANG at a McDonald's parking lot in San Francisco, California. This delivery was also corroborated by GPS tracking information.

2. **CS3**

CS3 was a percipient witness to charged offenses against the moving defendants.

a. **Ding Lin**

CS3 was a percipient witness as to charged offenses against Ding Lin, as alleged in the master search warrant affidavit:

E. Extortionate Extension of Credit and Use of Extortionate Means to Collect Credit at Oaks and Artichoke Joe's

32. During the course of this investigation, CS3 was able to secure extortionate extensions of credit from Lap The CHUNG and Bob YUEN at Oaks. CS3 was also able to secure extortionate extensions of credit from Hung TIEU and Ding LIN at Artichoke Joe's. As a result of non-payment on some of the loans, YUEN and LIN have used extortionate means to collect the loans from CS3. For example:

* * * *

e. … i. . . . .

ii. Later that day at Artichoke Joe's, CS3 was approached by Ding Lin. LIN said he had spoken to Hung TIEU regarding the repayment of the loan and that LIN would take the repayment. CS3 then gave LIN $3,500 in cash. LIN counted the money and put it in his pocket.

* * * *

i. On June 3, 2010, CS3 went to Artichoke Joe's to obtain another loan. CS3 called Ding LIN to find out who s/he could get money from. LIN

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

6

referred CS3 to WONG.  WONG gave CS3 $3,000 in chips from drawer after conferring with LIN on CS3's cell phone.[23]

23.  Based on these events, on February 24, 2011, the Grand Jury for the Northern District of California returned an indictment charging LIN and WONG with one count of Extortionate Extension of Credit Conspiracy and one count of Extortionate Extension of Credit.

* * * *

m.  On August 3, 2010, CS3 obtained a $5,000 loan from Ding LIN at Artichoke Joe's Casino.  LIN gave floor man John CHEW $5,000 in cash and CHEW in turn gave CS3 $5,000 in chips.  CS3 lost the $5,000 gambling and left the card club.[28]

28.  Based on these events, on February 24, 2011, the Grand Jury for the Northern District of California returned an indictment charging LIN and CHEW with one count of Extortionate Extension of Credit Conspiracy and one count of Extortionate Extension of Credit.

i.  CS3 did not make any loan payments to Ding LIN after s/he left Artichoke Joe's on August 3, 2010.  Since that time, LIN has contacted CS3 on numerous occasions pressuring CS3 to repay the loan.  During these conversations, LIN has made subtle threats to CS3 about his unpaid debt.  For example, on November 17, 2010, LIN contacted CS3.  LIN told CS3 that s/he had to pay within a few days, which CS3 agreed to do.  LIN called CS3 a "motherfucker" and told her/him that s/he must address the debt.

ii.  On February 15, 2011, CS3 and LIN again spoke via telephone.  During this conversation, LIN berated CS3 and accused CS3 of toying with him.  LIN called CS3 a "motherfucker" and asked CS3 if CS3 knew how LIN made a living.  LIN stated that he was counting on these debts to make a living.  CS3 asked LIN to stop the interest on the loans.  LIN responded that he would not stop the interest.[29]

29.  On February 24, 2011, the Grand Jury for the Northern District of California returned an indictment charging LIN with one count of Collection of Credit by Extortionate Means in violation of U.S.C. § 891(a)..

**b.  Lap The Chung**

The racketeering acts in support of the RICO charges that name Lap The Chung are acts 3, 4, 5, 7, 8, 14, where he is alleged to be involved in either a drug deal or conspiring to make an extortionate loan.  Those acts occurred between October 2009 and April 2010.  As a RICO defendant, all alleged acts of the defendants with informants could be admissible against Chung as co-conspirator acts or statements.

With regard to the substantive charges, Lap The Chung is charged with drug offenses in Counts 9, 12, 13, 16, 17, and 18 – either alone or with other codefendants -- and with making

7

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    extortionate loans in Counts 10, 11, 28, and 29 with Bob Yuen and/or May Chung.  Those

2    substantive offenses occurred between October 2009 and April 2010.  Basically, these crimes are

3    the acts alleged in support of the charged RICO conspiracies.

4         Lap The Chung dealt with CS3, as shown in these allegations in the search warrant

5    affidavit (BN 2125 – 2130, footnotes omitted):

6         31.  Beginning in approximately September 2009, a DEA/FBI cooperating source
       ("CS3") informed agents that s/he knew some targets at Oaks, including Asian
7       Gaming manager Lap The CHUNG. CS3 began working with agents by going to
       Oaks posing as a gambling customer and seeing if s/he could obtain narcotics or
8       potentially loansharking loans.  CS3 successfully obtained narcotics as described
       in more detail below:

9
       a.  On October 7, 2009, Lap The CHUNG, while working as an employee at Oaks
10      Card Club, gave CS3 a nine-tablet sample of ecstasy at Oaks.  CHUNG did not
       charge CS3 for these ecstasy tablets and told CS3 that he could get more ecstasy
11      if CS3 wanted it.

12      b.  On October 14, 2009, CS3 had a telephone conversation with Lap The
       CHUNG about obtaining more ecstasy.  While at Oaks later that evening,
13      CHUNG told CS3 that his "guy" wanted $5 per pill and asked if CS3 would be
       willing to pay that price.  CS3 agreed and gave CHUNG $500 in the form of five
14      $100 poker chips for 100 tablets.  Surveillance inside Oaks revealed that CHUNG
       spoke with a middle man and gave him the $500 in poker chips.  The middle man
15      met with Chea BOU, a card dealer at Oaks Card Club.  Ultimately, BOU pulled
       out a blue colored bottle out of his fanny pack.  After some further interactions
16      with BOU, the middleman went over to Lap The CHUNG and conversed at a
       desk near the podium which contains the "kwei tung."  Shortly thereafter,
17      CHUNG went over to CS3 and discreetly handed CS3 100 tablets of ecstasy.  The
       ecstasy was packaged in two small gold envelopes which appeared to have some
18      kind of official Oaks Cards Club markings on them.

19      c.  On October 20, 2009, CS3 spoke with Lap The CHUNG at Oaks and said s/he
       wanted to purchase around 1,000 ecstasy pills.  CHUNG told CS3 he did not want
20      to be in the loop with such a large transaction and that he would introduce CS3 to
       an ecstasy source of supply working at Oaks Card Club.  CHUNG proceeded to
21      take CS3 to the Texas Hold 'Em poker table where Chea BOU was working.
       CHUNG spoke with BOU and then pointed and nodded in the direction of CS3.
22      CHUNG told CS3 that the transaction would have to occur later that night when
       BOU got off work.  CHUNG told CS3 he would introduce them then.  However,
23      CS3 left prior to the meeting and obtaining the ecstasy.  The following day, CS3
       called CHUNG to arrange pickup of 1,000 pills.  Later that day, CHUNG met
24      with CS3 in the parking lot of Oaks Card Club and delivered 968 tablets of
       ecstasy to CS3 in exchange for $3,000.

25
       d.  On January 11, 2010, CS3 went to Oaks to discuss purchasing additional
26      ecstasy tablets from Lap The CHUNG and his associates.  Two days later, on
       January 13, 2010, CHUNG delivered 523 tablets of ecstasy to CS3 in the parking
27      lot of Oaks Card Club.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

e. Prior to March 18, 2010, CS3 had introduced BOU to an undercover DEA agent as someone interested in larger quantities of ecstasy, specifically 2,000 tablets. On March 18, 2010, the DEA undercover called BOU and said he was available to meet and purchase the ecstasy.' Later that day, BOU delivered 1,959 tablets of ecstasy to the DEA undercover in the parking lot of a McDonald's in Oakland, California, in exchange for $5,600.

\* \* \* \*

32. During the course of this investigation, CS3 was able to secure extortionate extensions of credit from Lap The CHUNG and Bob YUEN at Oaks. CS3 as also able to secure extortionate extensions of credit from Hung TIED and Ding LIN at Artichoke Joe's. As a result of non-payment on some of the loans, YUEN and LIN have used extortionate means to collect these loans from CS3. For example:

a. On October 14, 2009, CS3 was gambling at Oaks and asked Lap The CHUNG if he could borrow $3,000-$5,000 to gamble. CHUNG called Bob YUEN on his cell phone and handed the phone to CS3 after a brief conversation. CS3 told YUEN that he needed $3,000-$5,000 and YUEN told CS3 to hand the phone to May CHUNG (Oaks chip runner and sister of Lap The CHUNG). CS3 and May CHUNG walked to the podium drawer (the "Kwei Tung") and May CHUNG took out $5,000 in Oaks chips and handed them to CS3. May CHUNG appeared to write something in a black ledger on top of the "Kwei Tung" podium. CS3 subsequently won money gambling and attempted to repay the loan to YUEN who had since arrived at Oaks. YUEN referred CS3 to [redacted] for repayment. [redacted] told CS3 that the "juice" (interest on the loan) was 10%, so CS3 repaid [redacted] $5,500 in chips and gave an extra $100 in chips as a tip.

b. On October 20, 2009, CS3 entered Oaks Card Club and approached Bob YUEN for a $10,000 loan. YUEN then contacted Oaks chip runner May CHUNG and told her to provide CS3 with two $5,000 poker chips. May CHUNG reached into her chip apron and gave the chips to YUEN who gave them to CS3. CS3 then gave the chips to Lap The CHUNG, who changed them out for smaller denominations. That night, CS3 attempted to make a partial repayment of the loan to YUEN. YUEN referred CS3 to May CHUNG for repayment. CS3 repaid $4,500 of the $10,000 back to May CHUNG and discussed the terms of repaying loanshark loans with her. May CHUNG explained that "the juice" (interest) is 5% if repayment is made within the first three days of obtaining a loan and 10% per week after that.

i. A week later, on October 27, 2009, CS3 called Lap The CHUNG and told CHUNG that CS3 was out of town but had the money to repay the balance of the $10,000 loan obtained from YUEN the prior week. CS3 then called YUEN and told him that CS3 had the money and would be back in town in a couple of days.

ii. The next day, October 28, 2009, CS3 called YUEN and asked if it would be possible to repay the loan at Artichoke Joes's instead of Oaks Card Club because the Bay Bridge was closed that day. YUEN asked CS3 to come to Oaks or wait for him to come to San Francisco to collect the money personally. CS3 then called Lap The CHUNG and asked to repay the loan at Artichoke Joe's due to the Bay Bridge closure. CHUNG first suggested repaying the loan to an associate in San Francisco, but CS3 declined. CHUNG then said to put the money in the drawer ("Kwei Tung") at Artichoke Joe's and put his (CHUNG's) name on it. Later that day, CS3 went to

9

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Artichoke Joe's and repaid the loan balance to Artichoke Joe's employee John CHEW, who counted the money.  During that encounter, CS3 called Lap The CHUNG and handed the phone to Ky NG, another Artichoke Joe's employee. NG spoke to CHUNG on CS3's cell phone and gave the phone back to CS3. CS3 then wrote his/her name on a Post-it-Note and gave the note to CHEW, who put it on the loan repayment he received from CS3 and then put it in the "Kwei Tung."  CS3 then called Bob YUEN to advise him that the money was left in the drawer at Artichoke Joe's.  In total, CS3 paid $11,000 back on the loan with $10,000 representing principal and $1,000 representing the interest.

c.  On January 14, 2009, CS3 entered Artichoke Joe's and approached Hung TIEU (brother of Cuong Mach Binh TIEU), who is not an employee of the card club. CS3 asked Hung TIEU for a loan but Hung TIEU explained that he did not know CS3 well enough.  CS3 proceeded to call Lap The CHUNG and handed the phone to Hung TIEU who talked to CHUNG.  As an apparent result of this reference, Hung TIEU agreed to give CS3 a loan.  Hung TIEU and CS3 approached the drawer ("Kwei Tung") and contacted floorman Kwai WONG.  Hung TIEU took $5,000 out of his pocket and handed it to Kwai WONG, who then gave CS3 $5,000 in chips.  CS3 then proceeded to gamble and later that day called Hung TIEU (who had left the casino in the interim) to ask where s/he could re-pay the loan.  Hung TIEU told CS3 to repay the money to the drawer ("Kwei Tung"). CS3 gave $5,500, representing principal and 10% interest for the Hung TIEU loan, to Kwai WONG.

d.  On February 1, 2009, CS3 entered Artichoke Joe's intending to get another loan from Hung TIEU.  However, Hung TIEU was not present at the card club. CS3 called Lap The CHUNG to obtain a loan from Artichoke Joe's.  CHUNG told CS3 to look for Ding "Jeffrey" LIN.  CS3 looked through the card club for LIN but could not find him. . . .

* * * *

f.  On April 29, 2010, CS3 obtained a $3,000 loan from Lap The CHUNG at Oaks Card Club.  CS3 proceeded to gamble and win money.  CS3 then repaid CHUNG $3,000 plus $150 as 5% interest.  CHUNG took the money and gave it directly to Bob YUEN.  As a result of his gambling that day, CS3 won $12,000.  CS3 approached CHUNG and asked him if he could keep his/her winnings at the casino.  CHUNG agreed to put the $12,000 in chips in the drawer ("Kwei Tung"). CS3 then left Oaks but returned a few hours later.  At that time, CS3 asked CHUNG for the $12,000 and CHUNG gave CS3 $5,000 in cash from his pocket and $7,000 in cash from the drawer ("Kwei Tung").

* * * *

l.  On August 2, 2010, CS3 obtained two separate $10,000 loans from Bob YUEN at Oaks Card Club.  In each instance, YUEN provided CS3 with two $5,000 poker chips which CS3 exchanged for individual $100 chips.  CS3 lost all $20,000 s/he borrowed that night and left the establishment.

i.  On August 9, 2010, CS3 went to Oaks Card Club and repaid Bob Yuen one week's worth of 10% interest on the $20,000 in loans he borrowed on August 2, for a total of $2,000.  A week later, on August 16, 2010, CS3 called Bob YUEN and YUEN informed CS3 the deadline was up to make a loan payment.  CS3 responded that s/he could not pay yet. YUEN instructed CS3 to pay as soon as possible.

10

ii.  The next week, on August 23, 2010, CS3 called YUEN about making a payment on the loan.  YUEN instructed CS3 to give the loan re-payment to May CHUNG. CS3 then went to Oaks and made a $4,000 payment to YUEN, representing two weeks' worth of 10% interest on the original $20,000 loan obtained on August 2, 2010. CS3 then attempted to make an interest payment to Lap The CHUNG, but Lap The CHUNG instructed CS3 to give the payment to May CHUNG instead.

iii.  On August 31, 2010, CS3 went to Oaks and made a weekly 10% - $2,000 interest payment to Bob YUEN.  On September 8, 2010, CS3 returned to Oaks and made the weekly 10% - $2,000 interest payment to Bob YUEN.  On that day, CS3 requested YUEN to stop interest accumulation on the loan and YUEN declined.  CS3 proceeded to ask Lap The CHUNG if he could help stop the accumulation of interest.  CHUNG replied that YUEN was in charge of that.

**c.  <u>Bob Yuen</u>**

CS3 is a percipient witness to alleged acts by defendants Bob Yuen as follows (in addition to those cited above):

10/14/09 - CS3 allegedly received a $5000.00 loan from Yuen, which came directly from the drawer at Oaks Card Club.  The loan was repaid later that same night at ten percent interest.  He also purchased on the same day 100 Ecstasy pills from Chung for $500.00.

10/20/09 - CS3 allegedly got a $10,000 loan from Yuen, returned $4500.00 to May Chung who informed him that he would be charged only five percent interest on the remainder if he paid it back within three days.

5/20/10 - CS3 was provided $6500.00 for purposes of repaying the $5000.00 loan plus ten percent interest to Yuen, which had been borrowed on May 13.  After repayment, CS3 gambled with the remaining money, lost it, and took a $3000 loan from Thanh Chu.  Apparently, at least some of this was captured on a recording device.

7/29/10 - CS3 approached Yuen, requested and received a $10,000 "extortionate extension of credit." this was recorded and downloaded to a cd.

8/23/10 - CS3 was instructed to make contact with Yuen and/or Chung, he was provided $4000 by the FBI to pay Yuen for interest owed on a $20,000 loan, with instructions to also attempt to pay $500.00 partial interest on a loan provided by Ding Lin through Yuen at Oaks.  CS3 spoke to Yuen by phone; Yuen asked CS3 to pay May Chung $4000.00.  CS3 was unable to make payment to Lin through Yuen.  This transaction was recorded.

8/26/10 - CS3 placed a call to Yuen which was recorded.

9/8/10 - CS3 walked into Oaks with Yuen, and paid Yuen $2000.00.  The conversation was recorded.

**d.  <u>Kwai Ping Wong and Hung Tieu</u>**

CS-3 (aka SAI-045) is a percipient witness to all of the acts charged against defendants Kwai

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

11

Ping Wong and Hung Tieu and possesses unique knowledge and thus can provide exculpatory information regarding the acts charged against defendants that makes disclosure of the requested information critical to Mr. Wong's and Mr. Tieu's defense.  CS-3's unique knowledge and participation in the charged acts are set forth below:

**1) Facts Regarding January 14, 2010**

On January 14, 2010 at Artichoke Joe's casino, CS-3 called defendant Lap Chung seeking to repay a $3,000 balance owed from an unsolicited no-interest loan of $5,000 that Chung had provided to CS-3 at the Oaks Club casino on January 11, 2010. [BN 1706-07.]  CS-3 did not hear the name stated by Chung on the phone, but handed CS-3's phone to Artichoke Joe's floorman Kwai Wong at the kwei tung.  Wong spoke on CS-3's cell phone for "seconds" (which according to CS-3 had Chung on the line).  CS-3 spoke again with Chung, who told CS-3 that he did not have to pay any interest for the loan.  [BN 1707.]  Wong then received a stack of cash from CS-3 which Wong then counted and placed in a drawer for storage in the kwei tung.  [BN 1439, 1706-1707.]  CS-3 told Lap Chung by phone that he had given the payment to the floor manager, and asked where he could get more money if he needed it.  [BN 1707.]  Chung told CS-3 that he could get the money back from the drawer.  Special Agent Supervisor Aaron Wong instructed CS-3 not to take the money back from the drawer.  [BN 1707.]  Efforts to record these communications failed, so there are no recordings of any of the alleged conversations on January 14, 2010.  [BN 1432.]

As charged in Counts 19 and 20 and alleged in Racketeering Act 9, on January 14, 2010 at Artichoke Joe's casino, after the events described in ¶1, CS-3 solicited money from defendant Billy Ket Chau.  Chau pointed at defendant Hung Tieu.  In response, CS-3 approached Hung Tieu and asked for money.  [BN 1707.]  Hung Tieu declined until after Lap Chung spoke with Hung Tieu on CS-3's cell phone.  Hung Tieu then asked how much CS-3 needed, and agreed to lend CS-3 $5,000 as he requested.  According to CS-3 (the only non-defendant witness to this conversation), Hung Tieu told CS-3 that the interest would be ten percent every four days.  [BN 1708.]  Both men thereafter approached Artichoke Joe's floorman Kwai Wong at the kwei tung, where Hung Tieu paid $5,000 in cash from his left front pocket to defendant Wong, who removed

12

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

$5,000 in chips from the kwei tung drawer which he exchanged for Hung Tieu's $5,000 in cash. Wong handed the chip tray containing $5,000 worth of gambling chips to CS-3. [BN 1706, 1708.] Efforts to record these communications failed, so there are no recordings of any of the alleged conversations on January 14, 2010.  [BN 1432.]

On January 14, 2010 at Artichoke Joe's casino, after the events described in ¶2, CS-3 gambled and then called Hung Tieu (who had since left) and asked to whom he should pay back the loan. According to CS-2, Hung Tieu said to pay back the drawer.  CS-3 then contacted defendant Wong and gave $5,500 (presumably in chips) to Wong, who received the money and put it inside the kwei tung drawer.  [BN 1707-08.]

### 2) Facts Regarding February 1, 2010

As charged in counts 23 and 24 of the indictment, on February 1, 2010 at Artichoke Joe's casino, CS-3 called defendant Lap Chung seeking to obtain a loan.  Chung told CS-3 to find defendant Ding Lin.  CS-3 looked for Lin but could not find him.  CS-3 then left the casino and talked to the surveillance team outside.  After returning to the casino CS-3 was approached by defendant Bao Tran, a dealer at Artichoke Joe's.  Tran told CS-3 he could get him a loan and handed CS-3 a cell phone.  CS-3 took the phone and began speaking with defendant Hung Tieu. Tieu agreed to loan CS-3 $5000 and told CS-3 that Tran would get him the money.  After CS-3 got off the phone with Tieu, Tran briefly spoke to Tieu.  Tran and CS-3 then walked to the Pai Gow area together and contacted floorman John Chew.  Tran gave Chew $5000 in cash and Chew handed CS-3 $5,000 worth of chips.  [BN 1713-1714, 2129-2130.]

On February 1, 2010, after the events described in ¶4, Hung Tieu arrived at the cardroom and contacted CS-3.  Hung Tieu told CS-3 that the interest on the $5,000 loan was 10% per week. CS-3 agreed and the two proceeded to a smoking room area.  Inside the room Hung Tieu asked CS-3 if CS-3 grew or sold marijuana.  CS-3 told Hung Tieu that he could sell him marijuana and Hung Tieu gave CS-3 his cell phone number and told him to call him anytime for a loan.  CS-3 then paid Hung Tieu back $5,500 in chips.  [BN 1713-14.]

### 3) Facts Regarding February 4, 2010

As charged in Counts 25 and 26, on February 4, 2010 at Artichoke Joe's casino, CS-3 left

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                                    Case No. CR-11-0097 CRB (JCS)

the cardroom and called defendant Hung Tieu.  Shortly after, CS-3 approached Hung Tieu for a

loan inside the cardroom.  CS-3 secured a $5,000 loan from Hung Tieu inside the cardroom near

the video game area.  Hung Tieu told CS-3 to pay back cardroom dealer Bao Tran if CS-3 won.

Tieu told CS-3 that he could get another loan from Tran as well if CS-3 lost.  Tieu then left the

cardroom.  [BN 1717-18.]

### 4) <u>Facts Regarding June 3, 2010</u>

As charged in Counts 33 and 34, on June 3, 2010 at Artichoke Joe's casino, CS-3 called

defendant Lin and requested a $3,000 loan.  Lin asked CS-3 who was at Artichoke Joe's, then told

CS-3 that he would call him back.  Lin called CS-3 back and told CS-3 that "Sam Gor [referring to

defendant Wong] only gives it to me."  [BN 4064.]  CS-3 spoke to Floorman Kin Kwong, asking

to get some money, then approached defendant Kwai Wong.  [BN 1768, 4057.]  CS-3 told

defendant Wong "Jeffrey [referring to Ding Lin] told me to get 3,000."  Wong told CS-3 to call

Lin, stating "He needs to call...if he doesn't call, how am I going to give it to you?"  [BN 4057.]

Wong then advanced $3,000 worth of chips from the kwei tung drawer to CS-3, telling Lin that

Lin must clear the loan so Wong could balance the drawer by midnight.  [BN 1768.]

### 5) <u>Facts Regarding June 23, 2010</u>

As charged in Counts 36 and 37, on June 23, 2010 at Artichoke Joe's casino, CS-3 called

defendant Hung Tieu and asked for a $2,000 loan.  Hung Tieu told CS-3 to get it from Sam Wong.

Wong advanced $2,000 in gambling chips to CS-3 from the kwei tung.  It appeared to CS-3 that

Wong had already spoken to Hung.  Later that night, CS-3 met with Hung Tieu in person.  CS-3

asked Hung Tieu if he sold ecstasy and Tieu told CS-3 that he had some ecstasy but it was not

good.  Tieu told CS-3 that he would call him when he got new ecstasy.  CS-3 expressed interest in

buying two to three thousand pills when Tieu was ready.  CS-3 then repaid $2,200 directly to

Hung Tieu.  [BN 1777-78.]

### e.   <u>John Chew</u>

CS-3 (aka SAI-045) is a percipient witness to all of the acts charged against defendant John

Chew.  CS-3 also possesses unique knowledge and thus can provide exculpatory information

regarding the acts charged against Mr. Chew that makes disclosure of the requested information

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

critical to Mr. Chew's defense.  CS-3's unique knowledge and participation in the charged acts are

set forth below:

### 1) Facts Regarding February 1, 2010

As charged in counts 23 and 24 of the indictment, on February 1, 2010 at Artichoke Joe's

casino, CS-3 called defendant Lap Chung seeking to obtain a loan [BN 1713-1714, 2129-2130.]

Chung told CS-3 to find defendant Ding Lin.  CS-3 looked for Lin but could not find him.  CS-3

then left the casino and talked to the surveillance team outside.  After returning to the casino CS-3

was approached by defendant Bao Tran, a dealer at Artichoke Joe's.  Tran told CS-3 he could get

him a loan and handed CS-3 a cell phone.  CS-3 took the phone and began speaking with

defendant Hung Tieu.  Tieu agreed to loan CS-3 $5000 and told CS-3 that Tran would get him the

money.  After CS-3 got off the phone with Tieu, Tran briefly spoke to Tieu.  Tran and CS-3 then

walked to the Pai Gow area together and contacted floorman John Chew.  Tran gave Chew $5000

in cash and Chew handed CS-3 $5,000 worth of chips.  Later that evening, Tieu arrived at

Artichoke Joe's and talked with CS-3.  Tieu told CS-3 that the interest on the loan was 10% per

week.  CS-3Ghave Tieu $5,500 worth of chips.  *Id.*

### 2) Facts Regarding August 3, 2010

As charged in Counts 40 and 41, on August 3, 2010 at Artichoke Joe's casino, CS-3 called

defendant Hung Tieu to request a loan but was unable to reach him.  CS-3 then approached

defendant Ding Lin to request a loan.  Lin told CS-3 that he had $5,000 to loan.  CS-3 asked for

$10,000 but Lin said that $5,000 was all he had.  CS-3 and Lin then walked to the podium are of

the Pai Gow section and spoke to John Chew.  Lin gave Chew $5,000 in cash and Chew gave CS-

3 $5,000 worth of chips.  After CS-3 played one hand and lost all the money, he approached Lin

and asked for another loan.  Lin said he had no more money.  CS-3 then asked defendant Billy Ket

Chau for a loan.  Chau said he needed some collateral.  CS-3 said he didn't have any.  CS-3 then

left the casino.  [BN 1788-1789, 2135]

### f.  May Chung

CS3 is also a percipient witness as to defendant May Chung.  As alleged in the master

search warrant affidavit:

K A S O W I T Z ,  B E N S O N ,  T O R R E S  &  F R I E D M A N  L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

15

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

32.  During the course of this investigation, CS3 was able to secure extortionate extensions of credit from Lap The CHUNG and Bob YUEN at Oaks.  CS3 was also able to secure extortionate extensions of credit from Hung TIEU and Ding LIN at Artichoke Joe's.  As a result of non-payment on some of the loans, YUEN and LIN have used extortionate means to collect the loans from CS3. For example:

  a. On October 14, 2009, CS3 was gambling at Oaks and asked Lap The CHUNG if he could borrow $3,000-$5,000 to gamble.  CHUNG called Bob YUEN on his cell phone and handed the phone to CS3 after a brief conversation.  CS3 told YUEN that he needed $3,000-$5,000 and YUEN told CS3 to hand the phone to May CHUNG (Oaks chip runner and sister of Lap The CHUNG).  CS3 and May CHUNG walked to the podium drawer (the "Kwei Tung") and May CHUNG took out $5,000 in Oaks chips and handed them to CS3.  May CHUNG appeared to write something in a black ledger on top of the "Kwei Tung" podium.  CS3 subsequently won money gambling and attempted to repay the loan to YUEN who had since arrived at Oaks.  YUEN referred CS3 to [redacted] for repayment.  [Redacted] told CS3 that the "juice" (interest on the loan) was 10%, so CS3 repaid [redacted] $5,500 in chips and gave an extra $100 in chips as a tip.  [footnote omitted]

  b. On October 20, 2009, CS3 entered Oaks Card Club and approached Bob YUEN for a $10,000 loan.  YUEN then contacted Oaks chip runner May CHUNG and told her to provide CS3 with two $5,000 poker chips.  May CHUNG reached into her chip apron and gave the chips to YUEN who gave them to CS3.  CS3 then gave the chips to Lap The CHUNG, who changed them out for smaller denominations.  That night, CS3 attempted to make a partial repayment of the loan to YUEN.  YUEN referred CS3 to May CHUNG for repayment. CS3 repaid $4,500 of the $100,000 back to May CHUNG and discussed the terms of repaying loanshark loans with her.  May CHUNG explained that "the juice" (interest) is 5% if repayment is made within the first three days of obtaining a loan and 10% per week after that.  [footnote omitted]

                                    * * * *

  h. On May 20,2010, CS3 called YUEN from Oaks Card Club after s/he lost money gambling.  CS3 asked YUEN who would give him/her a loan.  YUEN told CS3 that he will let a third party know about CS3's need for a loan.  Shortly thereafter, Thanh CHU approached CS3 and removed $3,000 from his pocket.  CHU and CS3 walked over to May CHUNG.  CHU gave May CHUNG the $3,000 and May CHUNG gave CHU $3,000 in gambling chips which CHU then gave to CS3 as a loan.  [footnote omitted

                                    * * * *

## 3.  CS6

CS6 was a percipient witness as to several charged offenses.  As to defendant Bob Yuen

CS6 was an alleged percipient witness to the following:

9/15/10 - CS6 was provided with $3000.00 ($2000.00 to repay Yuen for two weeks' interest on a $10,000 loan, and $1000.00 for two weeks' interest on a loan from Phung).

CS6 stated that Yuen made eye contact after he entered, gestured to follow him to the smoking area where CS6 paid Yuen $2000.00.

9/22/10 - CS6 paid $1000.00 interest to Yuen, who was gambling at the Pai Gow tables. This was recorded.

9/29/10 - CS6 paid $6000.00 to Yuen, who had been seated at the Pai Gow tables. They walked to the smoking area where CS6 provided the money. Yuen told CS6 that he/she was $5000.00 short. CS6 asked for a lower interest rate and Yuen said no.

10/12/10 – CS6 paid $2,200 to Yuen towards the Yuen loan, representing $500 in interest and $1,700 towards principal. CS6 did not inform the FBI about this payment until October 14, 2010.

CS6 also was a percipient witness as to the extortionate extension of credit count charged against Bao Phung by allegedly obtaining a $5,000 loan from Bao Phung at the Oaks club on August 24, 2010.

### 4.   CHAS-S-00031617 (Sek Fook, Mui Tou)

8/10/10 - Fook was provided with $3000.00 by the FBI, tasked to make contact with Yuen and others at Oaks, wearing a body recorder. He met with various individuals, including Yuen and Hung Tran, Ah Hung, Bou (phonetic spelling). No other details are provided in this report.

8/27/10 - Fook was instructed to contact Yuen and/or Chung; he was provided with $3000.00 to gamble at Oaks and attempt to meet Yuen regarding an outstanding loan owed to Yuen. When debriefed he said that Yuen did not engage him on this matter.

10/14/10 - Fook paid Yuen $200.00, and asked Yuen where Phung was Phung was not currently at Oaks. Fook asked Yuen if he could give Yuen an additional $200.00 on Phung's behalf. Yuen agreed, and took the additional $200.00.

### 5.   Redacted Name In Master Search Warrant Affidavit And Indictment

At least one name is redacted in the indictment in this case. Indictment of 1, 2, 6, 8, 18-19, 22-23, 36-37, 40; Search Warrant Affidavit at 8, 12, 13, 18, 24, 25, 26. The redacted name(s) is, in some instances, a redaction as a defendant and, in others, as a percipient witness to alleged conduct of various defendants.

### ARGUMENT

This Court should order the government to disclose the identifying information of the confidential informants or cooperating witnesses sought above, as well as other related information that is material to the defense, and this Court should also order the government to produce any cooperating witness or confidential informants for defense interviews.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

17

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

# I.   COURT SHOULD ORDER DISCLOSURE OF THE INFORMANTS' IDENTITIES

The defendants are entitled to disclosure of the identity and location of any cooperating witness or confidential informant, and to all communications between the informant and the government, if the informant may provide exculpatory information or is a percipient witness to any conduct at issue at trial. *See Roviaro v. United States*, 353 U.S. 53, 60-61 (1957); *see also United States v. Bonilla*, 615 F.2d 1262, 1264 (9th Cir. 1980). Here, the informants were directly involved in the offenses and conduct charged in the indictment. At least some of the informants (i.e., CS1 and CS2) were involved in unrecorded contacts with the defendants and other individuals who allegedly put the defendants in contact with informants. The information sought by the defense should be disclosed because the informants are material and percipient witnesses and also because the information is necessary for the defendants to investigate an entrapment defense. *See United States v. Williams*, 2010 WL 3447704 (N.D. Cal., Aug. 30, 2010) (Case No. 10-0230 SI).

In *Roviaro*, the Supreme Court recognized a limited government privilege to withhold the identity of an informant. However, the Court held that this privilege must give way "where the disclosure of an informant's identity or the content of his communications is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause." *Roviaro*, 353 U.S. at 60-61.

The facts of *Roviaro* case well illustrate the necessity of disclosure in the present case. The Court's description of the issue presented in *Roviaro* parallels the informants' roles in the present case:

> The principle issues is whether the United States District Court committed reversible error when it allowed the Government to refuse to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged. For the reason herein stated, we hold that, under the circumstances here present, this was reversible error.

18

1   *Id.* at 55.  As here, the informant in *Roviaro* was a percipient witness to conduct that may be at

2   issue at trial.  In *Roviaro*, failure to disclose the informant was reversible error.  Accordingly,

3   disclosure in the present case is also required.

4          To warrant disclosure under *Roviaro,* the defendant must have "more than a 'mere

5   suspicion' of the value of the informant's identity."  *United States v. Amador-Galvan*, 9 F.3d

6   1414, 1417 (9th Cir. 1993).  Here, the defendants have far more than a "mere suspicion" of the

7   value of the informants in this case – indeed, the informants are percipient witnesses to the

8   charged conduct and are alleged to have had interactions with others who connected defendants

9   to informants in order to distribute controlled substances.  This Court should accordingly order

10   disclosure under the *Roviaro* balancing test.

11          **A.      *Roviaro* Balancing Test Favors Disclosure Of Identifying Information**

12          Once, as here, a defendant has shown that an informant is a percipient witness or could

13   provide exculpatory information, this Court must then "apply a balancing test, weighing the public

14   interest in encouraging citizens to inform the government about criminal activity, against an

15   accused's right to prepare his defense."  *Amador-Galvan*, 9 F.3d at 1417.  The *Roviaro* balancing

16   depends on the circumstances of each case, but the factors include: the nature of the crime

17   charged; the possible defenses; the significance of the informant's testimony; and other relevant

18   factors.  *See Roviaro,* 353 U.S. at 62.  Each factor, discussed in turn below, weighs in favor of

19   disclosure of the informant's identity.

20          **1.      No safety concerns weigh against disclosure**

21           The primary factor in the *Roviaro* balancing test is the government's interest in protecting

22   the safety of the informant.  *See United States v. Sai Keung Wong*, 886 F.2d 252, 255 (9th Cir.

23   1989).  There is nothing to suggest that the defendants pose any danger to the informants – all of

24   whom are known, but not yet officially disclosed by the government.  Defendants Skyler Chang,

25   Cuong Tieu, and Ding Lin are currently in custody where their calls and mail are recorded.  Nor

26   were the moving defendants found to be in possession of any firearms or weapons of any kind,

27   any ammunition, or other items such as bullet-proof vests.  In the absence of a particularized

28   showing by the government of a danger to any informant posed by the moving defendants, and a

19

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   determination by this Court that this factor outweighs their rights to prepare a defense, the

2   informants' identities must be disclosed.

3        Moreover, even if the government were to put the safety of the informant at issue based

4   upon some heretofore undisclosed allegation, it would be "error of constitutional dimension to

5   deny disclosure solely because of the potential danger."  *United States v. Ordonez*, 737 F.2d 793,

6   809 (9th Cir. 1983).  Rather, this Court must then balance the safety concerns against the right to

7   prepare a defense, taking into consideration the other *Roviaro* factors, in order to ensure "the

8   preservation of due process."  *Id*. at 808.

9                      **2.       The crime charged does not allege violence by the defendants**

10       The nature of the charges against the moving defendants is exactly the type that supports

11  disclosure.  There is nothing in the present offense as charged by the government that suggests

12  any violent conduct or current threats by any of the defendants.  This is precisely the sort of case

13  that this Court held in *Roviaro* would warrant disclosure.

14                     **3.       The information is necessary for the defendants' defense**

15       The unique knowledge by the informants of the facts underlying this case makes

16  disclosure of their identifying information necessary to the defense.  The informants are

17  percipient witnesses to the conduct charged in the indictment.  More importantly, the informants

18  are the only witnesses to critical occurrences in this case – conversations or actions with the

19  moving defendants charged in the indictment, and, for example, CS1's and CS2's initial

20  approaches to Skyler Chang and numerous unrecorded conversations between the CS1 and CS2

21  and Skyler Chang.

22       The informants are the material percipient witnesses in the case who helped set up the

23  alleged criminal occurrences and who were present during the negotiations and the delivery of

24  the charged controlled substances offenses and extortionate credit offenses.  Because not all of

25  the contacts between the informants and others, including CS1 and CS2, were recorded, they are

26  the only witnesses for many of the alleged conversations and contacts that occurred.  *See*, e.g.,

27  *Roviaro*, 353 U.S. 64 (noting that defendant's own potential testimony and testimony of a

28  government agent are no substitute for the testimony of an informant who had helped to set up

20

the criminal occurrence); *see also*, *Williams*, 2010 WL 3447704, *3 (holding that disclosure of the informant's identity was required in part because the informant was the only witness to certain events in light of the defendant's constitutional right not to take the stand).  The credibility of the informants will be critical to the case.

Additionally, the informants could play a critical role in a possible entrapment defense.  The desirability of interviewing the informant in preparation for trial "is a matter for [the defendants] to decide."  *Roviaro*, 353 U.S. at 64 ("The desirability of calling [the informant] as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide.").  Here such potential interviews are essential, so the informant should be disclosed.  As Judge Illston recently determined in *Williams*, where a potential entrapment defense is involved, as it is here, the identity of the CI is of particular importance to the defendant in preparing and investigating his defense.  *Williams*, 2010 WL 3447704, *3.

### 4.      Other relevant factors support disclosure

The "other relevant factors" at issue in *Roviaro* include concerns such as "lessen[ing] the risk of false testimony" and aiding in "secur[ing] useful testimony."  *McLawhorn v. State of North Carolina*, 484 F.2d 1, 4-5 (4th Cir. 1973).  Disclosure of an informants' identifying information would lessen the risk of false testimony by the informants by providing for meaningful cross examination.  Disclosure would also aid the moving defendants in securing exculpatory evidence by permitting them to investigate adequately the backgrounds of the informants.

Thus, each *Roviaro* factor weighs in favor of disclosure.  Accordingly, this Court should order the government to disclose the identity of the informants without further delay.

### B.      Disclosure Of Informant Location And Communications Also Required

The rule enunciated in *Roviaro* requires not only disclosure of the informant's name, but also his or her location and communications with the government.  *See Roviaro*, 353 U.S. at 60-61.  This identifying information enables defense counsel to contact the informants and meaningfully investigate such issues as background and credibility.  *See United States v. Hernandez*, 608 F.2d 741, 745 (9th Cir. 1979) (acknowledging that address of principal witness

21

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  is an integral element of identity).  Accordingly, pursuant to the same *Roviaro* balancing factors,

2  this Court should order the government to disclose the location of the informants sough by this

3  motion, as well as any communications they have had with the government.

4      Moreover, the government's duty to disclose does not stop with this identifying

5  information required under *Roviaro*.  The moving defendants further request that the informants

6  be produced for interviews.  The Ninth Circuit has held that the government has an obligation to

7  "accomplish this or show that, despite reasonable efforts, it was not able to do so."  *United States*

8  *v. Hart*, 546 F.2d 798, 798-99 (9th Cir. 1976) (*en banc*); *see also United States v. LaRizza*, 72

9  F.3d 775, 779 (9th Cir. 1995) (reaffirming that the government "is required to exert reasonable

10  efforts to produce an informant whenever the informant's presence has been properly requested

11  by the defendant"); *United States v. Montgomery*, 998 F.2d 1468, 1472-73 (9th Cir. 1993)

12  (same).

13  **II.   THIS COURT SHOULD ORDER DISCLOSURE OF FAVORABLE
           MATERIAL PERTAINING TO INFORMANT'S CREDIBILITY**
14

15      A focal point of the defendants' trial defenses might well include entrapment and

16  undoubtedly, attacks on the credibility of the various informants.  This Court should accordingly

17  order disclosure without further delay of the information material to the credibility of the

18  informants that either is in the possession of the government or can be obtained by the

19  government through the joint efforts with the state law enforcement authorities used in this case.

20      The Supreme Court has long required the government to furnish the defendant with all

21  favorable evidence material to the issue of guilt or punishment.  *See Brady v. Maryland*, 373

22  U.S. 83 (1963).  The Ninth Circuit encourages a liberal construction of the *Brady* disclosure rule:

23  "[A]n elemental sense of fair play demands disclosure of evidence that in any way may be

24  exculpatory . . . . [T]he government should resolve all doubts in favor of disclosure . . . since

25  disclosure could cause no harm to the Government while suppression could very well prejudice

26  the defendant." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976).

27      The Supreme Court has also long held that evidence impeaching the credibility of a

28  testifying law enforcement witness is covered by the *Brady* doctrine.  *See Giglio v. United States*,

22

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    405 U.S. 150, 153-55 (1972); *see also United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir.

2    1986).  The fact that exculpatory evidence may concern an informant does not relieve the

3    government of its burden under *Brady*.  *See United States v. Van Brandy*, 726 F.2d 548 (9th Cir.

4    1984).  Furthermore, the requested informant discovery is discoverable under F.R. Crim. P. Rule

5    16.  Evidence is material under Rule 16 if it is relevant to the development of a possible defense.

6    *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *United States v. Clegg*, 740 F.2d

7    16, 18 (9th Cir. 1984).

8         The Ninth Circuit emphasized the importance of impeachment material against informants

9    in its decision in *Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998).  In *Singh*, the court granted the

10   habeas petition of an inmate convicted of murder and solicitation to commit murder.  *See id*. at

11   1158.  The prosecutor had failed to disclose material exculpatory evidence to the petitioner;

12   specifically, the benefits an informant had received for his testimony.  *See id*. at 1159.  Despite

13   considerable evidence of petitioner's guilt, the court in *Singh* found the failure to disclose the

14   informant's benefits fatal to the State's case:

15        [O]ur fundamental concern remains whether there exists a reasonable probability
          that given disclosure of the evidence of benefits to [the informant], one or more
16        members of the jury would have viewed [the informant's] testimony in a different
          light. Given the importance of [the informant's] testimony to the prosecution's
17        case, and the impact the disclosure of evidence of the benefits provided to [the
          informant] could have had on [his] credibility, we believe there is a reasonable
18        probability that had the evidence been disclosed to the defense, one or more
          members of the jury could have viewed [the informant's] testimony differently.
19

20   *Id*. at 1163.

21        The informants in this case are as important to the moving defendants as was the

22   informant shielded by the prosecutor in *Singh*.  Despite the centrality of their testimony and

23   repeated requests from the defense, the government has not produced exculpatory information

24   about these key percipient informant witnesses.  It is the government's obligation to affirmatively

25   seek out evidence from the law enforcement officers who cooperated in this investigation; "the

26   individual prosecutor has a duty to learn of any favorable evidence known to others acting on the

27   government's behalf in the case, including the police."  *Kyles v. Whitley,* 514 U.S. 419, 437

28

Defendants' Mot to Disclose Informants                    Case No. CR-11-0097 CRB (JCS)

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  (1995).  The government thus has the obligation to affirmatively seek out any potentially

2  impeaching material regarding any informants or cooperating witnesses.

3       Along these lines, the Ninth Circuit has reversed a conviction where the government

4  counsel failed to obtain and disclose *Brady* impeachment material regarding the confidential

5  informant.  *See United States v. Blanco,* 392 F.3d 382, 392 (9th Cir. 2004).  As the Ninth Circuit

6  in *Blanco* explained, "[b]ecause the prosecutor is in a unique position to obtain information

7  known to other agents of the government, it may not be excused from disclosing what it does not

8  know but could have learned." *Id.* at 388 (citation and internal quotation marks omitted).

9       Since the testimony of the informants will be central to the defenses of the moving

10  defendants, the Court should compel the government to obtain and disclose all information

11  bearing on their credibility without further delay.  *Giglio/Brady* material must be disclosed now

12  to permit the moving defendants to make effective use of the information at trial.  *Weatherford v.*

13  *Bursey,* 429 U.S. 545, 559 (1997); *Gantt v. Roe,* 389 F.3d 908, 912 (9th Cir. 1993) (*Brady* not

14  confined to evidence that affirmatively proves innocence but need merely be favorable to the

15  accused; no good faith, negligence, or inadvertence requirement for *Brady* violation); *United*

16  *States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).  Defendants Skyler Chang, Cuong

17  Tieu, and Ding Lin have a trial date set for March 15, 2012, and need disclosure of such

18  exculpatory materials now, not later, to make effective use of them in investigations in

19  preparation for trial.  In addition, all defendants have a November 30, 2011, filing date for any

20  wiretap suppression motions in this case and also need such disclosures for potential for use in

21  other pretrial motions (for example, comparing the allegations regarding the informants found in

22  the master search warrant affidavit and the wiretap affidavits with what where the actual

23  agreements and benefits provided by the government to such informants, which may give rise to

24  a *Franks* suppression motion challenge to such affidavits).

25  **CONCLUSION**

26       For the aforementioned reasons, the Court should order the government to disclose the

27  requested information relating to the confidential informants without further delay.

28

24

Defendants' Mot to Disclose Informants                            Case No. CR-11-0097 CRB (JCS)

1

2    DATED:  October 26, 2011

3

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

4

5

By:  /s/ Marcus S. Topel

By:  /s/ Daniel F. Cook

6

7

Counsel for Defendant
SKYLER CHANG

8    Dated: October 26, 2011

9

10

By:  /s/ Richard B. Mazer           By:  /s/ Tony Tamburello

    Counsel for Defendant                  Counsel for Defendant

11      CUONG TIEU                        DING LIN

12    By:  /s/ Doron Weinberg             By:  /s/ Gail Shifman

      Counsel for Defendant                  Counsel for Defendant

13      BOB YUEN                         HUNG TIEU

14

By:  /s/ Robert F. Waggener       By:  /s/ Scott A. Sugarman

15      Counsel for Defendant                  Counsel for Defendant

16      MAY CHUNG                    LARRY CHUNG

17    By:  /s/ Suzanne A. Luban         By:  /s/ Galia A. Phillips

18      Counsel for Defendant                  Counsel for Defendant

      KWAI PING WONG               JOHN CHEW

19

20    8105145v2

21

22

23

24

25

26

27

28

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Defendants' Mot to Disclose Informants                          Case No. CR-11-0097 CRB (JCS)