Richard B. Mazer
99 Divisadero Street
San Francisco, California 94117
Telephone: (415) 621-4100
Facsimile: (415) 621-4111
Email: richardbmazer@gmail.com

Attorney for Defendant
CUONG MACH BIHN "STEVE" TIEU

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Docket No. 3:11CR00097-001 CRB |
| Plaintiff, ) | |
| ) | DEFENDANT'S SENTENCING |
| vs. ) | MEMORANDUM |
| ) | |
| CUONG MACH BIHN "STEVE" TIEU, ) | Date: December 5, 2012 |
| ) | Time: 2:00 p.m. |
| Defendant. ) | |

### I. INTRODUCTION

Without benefit of a Plea Agreement, Steve Tieu pled guilty to the following offenses:

Count 1: A violation of Title 18 USC 1962(d), RICO Conspiracy;

Count 2: A violation of Title 18 USC 1962(c), RICO;

Counts 3 & 7: A violation of Title 21 USC 846, Conspiracy to Violate Controlled Substances Act (Methamphetamine);

Count 4: A violation of Title 21 USC 841(a)(1), Possession With Intent to Distribute and Manufacture a Controlled Substance (Methamphetamine);

Count 5: A violation of Title 21 USC 846, Conspiracy to Violate Controlled Substances Act (Ephedrine);

Count 6: A violation of Title 21 USC 841(c)(2), Possession and Distribution of

1       Listed Chemical to Manufacture a Controlled Substance (Ephedrine);

3       Count 8: A violation of Title 21 USC 841(a)(1), Possession With Intent to
4       Distribute, Distribution and Manufacture of a Controlled Substance
5       (Methamphetamine);

7       Count 21: A violation of Title 21 USC 846, Conspiracy to Violate Controlled
8       Substances Act (Cocaine); and

10      Count 22: A violation of Title 21 USC 841(a)(1), Possession With Intent to
11      Distribute and Distribution of a Controlled Substance (Cocaine).

13      The United States Probation Office has prepared a Presentence Report (PSR) and

14 concluded that the advisory United States Sentencing Guideline (USSG) in this case is Total

15 Offense Level 41, Criminal History Category IV. For the reasons set forth below, Mr. Tieu

16 objects to the Guideline calculation in the PSR, as well as some factual information, and requests

17 that the Court find that the advisory USSG is Total Offense Level 37, Criminal History Category

18 IV, 292-365 months.

19      Mr. Tieu comes now before the Court requesting that the Court find that there is a basis

20 for a downward variance from the Guideline range, including 1) within case sentencing disparity;

21 2) Mr. Tieu's role in the offense; and 3) Mr. Tieu's "lack of youthful guidance" and early family

22 history. Mr. Tieu requests that the Court sentence him to 168 months imprisonment, to be

23 followed by a five year term of supervised release and that the Court recommend that he be

24 afforded the drug treatment services of the Residential Drug Treatment Program (RDAP) offered

25 by the Federal Bureau of Prisons.

26                                 **II. BACKGROUND**

27      Although ethnic Chinese, Steve Tieu was born in South Vietnam in 1969. His father was

28 a sergeant in the Army of the Republic of Vietnam and fought alongside United States troops.

1    Steve's first six years of his life was characterized by his father's absence and the violence that

2    the war caused. He witnessed the demise of his parents' marriage due to their chronic separation

3    and the ravages of war. He witnessed as a young child many deaths due to the war. After the war,

4    life did not improve for Steve and his family.

5         The Tieu family was denied employment and education opportunities and was harassed

6    after the Communist takeover of South Vietnam, due both to his father's military history and the

7    fact of being ethnic Chinese. Steve's parents were divorcing when, at age 8, he, his father, a

8    brother, his paternal grandmother, paternal aunt and cousin first attempted to escape Vietnam.

9    Steve's father made it to the main boat for escape, but the rest of the family members did not.

10   They were all arrested and imprisoned for a little over a month. Steve's father returned, refusing

11   to leave without the members of his family.

12        After waiting for a time, Steve and his family members attempted a second escape,

13   leaving behind Steve's mother and several siblings. This time they were all successful at getting

14   aboard the boat that was to take them to Malaysia. They were at sea for four days, during part of

15   which their boat was forced to outrun Thai pirates who attempted to prey upon the boat of

16   refugees. They eluded the pirates. However, the 300 people on board the boat had no food or

17   toilet facilities and they lived in filth and squalor for the entire time, often becoming deathly ill.

18   However, they were successful in reaching Malaysia, where for over a year period the family

19   was interred in three different refugee camps, including the infamous Pulau Bidong camp

20   (Description available at http://en.wikipedia.org/wiki/Bidong_Island).

21        Steve, his father and brother scavenged for food during the years that they lived in the

22   camps. There were frequent robberies and violence in the camp, primarily related to basic

1  resources. As Steve recalled, "If you had food, they thought you had money." During the year in

2  the camps, the family ate on average one meal per day. In 1980, a local church sponsored Steve

3  and his family members to enter the United States as refugees. Steve recalled that they arrived in

4  the San Francisco Bay Area on his grandmother's 92nd birthday.

5        Steve's cousin Samantha Tieu has written a letter to the Court describing some of the

6  experiences in the camps that she and members of her family, including Steve, endured. She

7  credits Steve in significant part with the family's survival.

8        Upon arrival in the Bay Area, Steve and his family moved into the Richmond, California,

9  apartment of a cousin, who had preceded them here. Steve entered El Portal Elementary School.

10 There was no English as a Second Language Program at that time. He was forced to learn

11 English on his own. His English speaking skills gradually improved as he progressed through

12 elementary school. Steve's father was able to find employment nearby their apartment at

13 Imported Auto Body, a business he would eventually part own. After a year, his employment

14 enabled the family to obtain their own apartment in Richmond. Mr. Tieu was successful in

15 supporting his family after arrival in the United States. That support, however, came at a

16 considerable price. He was absent from the family for many hours six days per week, unable to

17 provide the parental supervision necessary to the development of a child, particularly a child in a

18 new land, who was forced to deal with the cruelties of neighborhood childhood and adolescence.

19       After El Portal Elementary School, Steve entered Helms Junior High School in

20 Richmond. His English had improved considerably. Growing up with essentially no parental

21 supervision in the United States, Steve began to spend more and more time "on the streets." In

22 the 7th grade he got in trouble for stealing a newspaper box and extracting the coins. He was able

1  to get through middle school, but throughout he had to deal with the taunts and harassment from
2  other children because of his language skills and ethnicity. In particular, in Richmond he was
3  frequently jumped by Black kids in the neighborhood. Steve learned to fight to protect himself,
4  often unsuccessfully, but those confrontations brought him to the attention of school officials.
5      After Helms Junior High School, Steve entered Richmond High School, where the ethnic
6  harassment and physical confrontations became more intense. In the 10th grade, Steve got in
7  trouble with the law again. He attempted to steal a necklace. He was expelled from Richmond
8  High and sent to the Contra Costa County Juvenile Probation "Byron's Boys Ranch" for 150
9  days. Upon his release, he entered Samuel Gompers Continuation High School. He dropped out
10 before graduating.
11     The single most serious prior offense committed by Steve took place in Fresno,
12 California, in 1988. Steve was driving with several friends from Richmond to meet other friends
13 in the Los Angeles area. Late at night they stopped at a convenience store just off Highway 99.
14 As they were entering the store a group of young Black males were also entering the store. As
15 both groups left the store, Steve was confronted by racial slurs from one of the group of Black
16 males. He was challenged to a fight and the Black male advanced on him. One of Steve's
17 companions had a small caliber handgun and tossed it to Steve. Steve yelled at the advancing
18 male, who did not stop. Steve shot him once. He and his friends then fled the scene, but were
19 stopped by police nearby. Pursuant to a plea agreement, Steve was sentenced to state prison for
20 11 years. He was 18 years old at the time.
21     Steve has expressed great remorse for his actions. He has stated to counsel that the
22 confrontation that night brought him back to his childhood when he was often beaten up in the

1  neighborhood. He overreacted out of anger and fear. He was paroled in 1994 and successfully
2  completed that parole.
3      When he was released from prison, Steve returned to his father' apartment in Richmond
4  and began working with his father, who had become a partner in Imported Auto Repair. Steve
5  learned auto mechanics and body work and stayed at Imported Auto Repair for a year. He then
6  took a job as a security guard for ABC Security of Oakland, and was assigned posts at the
7  Emeryville Farmers Market and the San Francisco Examiner plant in Richmond.
8      Steve has had two significant relationships in his life, both of which have produced two
9  children. With Nicki Phung of Richmond, Steve has two children age 8 and 14. With Lily Tran
10  of Texas, he has two children 7 and 3. Steve maintains contact with his children as best as he
11  can. He was with them regularly before his arrest in the instant case in March 2011.
12      Since his release on parole in 1994, Steve has maintained employment. After he left the
13  security guard position, he began working as an assistant electrician for "Wabtech," a services
14  sub-contractor for BART. As verified by the PSR (¶ 472), Steve went to work for LA Tech
15  Autobody in Richmond. He has worked both full and part time at LA Tech, depending on the
16  volume of business. In 2008, Steve began working half time for Dreams Autobody in Pinole. He
17  maintained both of these employments up until his arrest.
18      Steve does not deny in any way his involvement in illegal activity. By his "open plea" he
19  has accepted full responsibility for his conduct. However, Steve wishes the Court to know that he
20  also maintained legitimate employment during times that he was engaged in illegal activity,
21  addressed below.
22

## III. OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Tieu's objections to the PSR fall within two categories: 1) the PSR increases for Role in the Offense pursuant to USSG 3B1.1, and 2) the PSR's failure to group all of the drug and/or RICO counts. Mr. Tieu requests that the Court find that the advisory Guideline is Total Offense Level 37, Criminal History Category IV.

*1) Role in the Offense:* There are fundamentally four areas of criminal activity incorporated in this RICO prosecution: A) the one pound methamphetamine transaction, B) the 25 kilogram ephedrine transaction, C) the "5 kilogram" cocaine conspiracy, and D) the loan sharking activities.

**A. One pound methamphetamine transaction:** Steve Tieu was NOT in the methamphetamine business when he was contacted by Skylar Chang, who was seeking a methamphetamine source. Steve stated that he would ask people he knew who were able to provide methamphetamine. He made that contact and connected the source with Mr. Chang. Steve Tieu was NOT compensated for helping Mr. Chang, whom he had known for years and with whom he believed he had a friendship. Steve Tieu was involved in the drug world, but not the methamphetamine world. He asked for no compensation and he received none. He was not a manager of anyone in this transaction. Discovery reveals that when Mr. Chang inquired about the price of the methamphetamine, Steve Tieu had to contact the source to find out. He neither owned the methamphetamine, nor was he to profit from the transaction. He was simply a communications conduit with no authority over any one in this transactions. There should be no role in the offense adjustment as asserted in the PSR (¶ 70).

**B. 25 kilogram ephedrine transaction:** Skylar Chang again contacted Steve and told

1   him that Chang needed money and was offering to sell drugs. The offer was somewhat vague,

2   but Steve agreed to a transaction. Initially, Steve actually thought the drugs involved were

3   MDMA, a business that Steve had been involved with. Steve obtained a "loan" from the Oaks

4   with which to make the purchase. Steve was BUYING the drugs from Skylar Chang. Chang was

5   selling them. Steve had no control over Chang, nor did he direct his activities. They were

6   engaged in a commercial transaction, albeit an illegal one.

7       Similarly, when Steve learned the contraband was ephedrine, he initially believed that he

8   could make MDMA out of it, something in which he was interested. However, he was informed

9   that it was methamphetamine that could be made. Steve contracted with another person to try to

10   make methamphetamine out of the ephedrine, but the work was of poor quality. Steve was to

11   purchase this service; he was not in charge of it.

12       Steve Tieu did direct Chea Bou to pick up and deliver the contraband. Steve was the

13   manager/supervisor of Bou, but no one else. This should result in a two level upward adjustment

14   under USSG 3B1.1(c), not four levels as asserted in the PSR (¶ 77).

15       **C. The cocaine conspiracy:** Steve Tieu was interested in purchasing cocaine and he did

16   direct the activities of Chea Bou in the quest to obtain cocaine. There was talk of 5 kilograms of

17   cocaine, but, as indicated in the PSR (¶¶ 52-55), throughout this conspiracy only 2.75 kilograms

18   of cocaine actually changed hands. Steve did obtain money from the Oaks to finance these

19   purchases. Consequently, there should be a two level upward adjustment pursuant to USSG

20   3B1.1(c), not a four level adjustment as asserted in the PSR (¶ 133).

21       **D.The loan sharking activities:** With respect to the loan sharking activities, the PSR (¶

22   35) has got it right. According to the report, ". . . Other members of the enterprise engaged in

loansharking at the casinos, but Tieu is not believed to have played a major role in those activities." In fact, Steve knew about the loansharking activities, as a number of friends and acquaintances were involved. Steve also obtained loans from the casino "kwei tungs" with which to engage in illegal activity. However, he did not direct the activities of anyone involved in loan sharking, nor did he provide "muscle" for anyone involved in loan sharking. He knew the players and what they were doing. He was not a manager or supervisor of any one in that endeavor. He did not receive a cut of the profits. Numerous paragraphs in the PSR ascribe a four level upward adjustment for Steve's so-called role in the loan sharking enterprise, to which he objects. However, under the technical application of the Guidelines, those counts will not increase the offense level.[1]

***2. Failure to group properly under RICO:*** All of the drug counts (Racketeering Acts related to drugs) should be grouped pursuant to USSG 3D1.2(d). The PSR presently separates out Racketeering Act 1 and Racketeering Act 2, and then applies the Multiple Count Rules as if they were to be considered separately (PSR ¶¶ 66-79, 248). They are not. USSG 2E1.1, comment. (N. 1), instructs that with respect to both 2E1.1(a)(1) and (a)(2), apply Chapter 3, Parts A, B, C, and D. Section D instructs to group counts:

> "When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."

The section then continues to include USSG 2D1.1, applying to drug counts, in this section. See, *United States v. Nguyen*, 255 F.3d 1335, 1344-45 (11th Cir. 2001) (directing that USSG 3D1.2 is

---

[1] Even with a four level upward adjustment the resulting level is 24, far below the "within 8 levels" to be counted in the Multiple Count Adjustment USSG 3D1.4.

to be applied in its entirety).

Therefore, under the Rico counts, all of the drug Racketeering Acts should be grouped.[2]

Thus, group Acts 1, 2, 3, 5, 7, 8, 13, and 18. It is all controlled by Racketeering Act 2. Therefore, Paragraphs 67-86, 94-100, 108-121, 150-156, and 185-191, should be consolidated to Racketeering Act 2, or Paragraphs 73-79, resulting in a Level 38.[3]

Consequently, Mr. Tieu requests that the Court determine that a two level upward adjustment is warranted under USSG 3B1.1(c), that all of the drug Acts should be grouped under Counts 1 and 2, and that the Adjusted Offense Level is 40. With the appropriate three level reduction for Acceptance of Responsibility pursuant to USSG 3E1.1(a)&(b), the result is Total Offense Level 37.

## IV. A REASONABLE SENTENCE

The landmark decision in *United States v. Booker*, 160 L. Ed. 2d 621, 125 S.Ct. 738 (2005), changed sentencing in the Federal Courts. *Booker* renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in Title 18 USC 3553(a). Further:

> "We infer appropriate review standards from related statutory language, the structure of the statute, and the 'sound administration of justice.' And in this instance those factors, in addition to the past two decades of appellate practice in cases involving departures, imply a practical standard of review already familiar to appellate courts: review for 'unreasonableness.'"
>
> . . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." *Booker*, at 660-661.

---

[2] Counts 1 and 2 are also to be grouped as Count 1 is a conspiracy to commit Count 2.
[3] As Mr. Tieu also asserts that two levels should be added for Role in the Offense, not four levels, the result before reduction for acceptance of responsibility is Level 40.

The Court must now consider 18 USC 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed --

    (a) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

    (b) to afford adequate deterrence to criminal conduct;

    (c) to protect the public from further crimes of the defendant; and

    (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentence and the sentencing range;

(5) Any pertinent policy statements;

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) The need to provide restitution to any victims of the offense.

As the Court is aware, co-defendant Skylar Chang was sentenced to 144 months imprisonment after entering into a Plea Agreement following opening statements and initial testimony in a trial. It was Skylar Chang who approached Steve Tieu seeking methamphetamine and it was Skylar Chang who offered to sell ephedrine because he "needed the money." Steve Tieu received no compensation for his involvement in connecting Chang to a methamphetamine source. He borrowed money to buy the ephedrine offered by Chang and was apparently incapable

of utilizing the ephedrine after he received it. Any sentence imposed should be imposed with the acknowledgment that Chang and Steve Tieu occupy similar positions of culpability in this RICO prosecution. Skylar Chang's role in the methamphetamine and ephedrine aspects of this case is greater than that of Steve Tieu. Mr. Tieu, however, has responsibility for the cocaine aspect. Neither individual appears to have played a significant role in the loan sharking.

Steve Tieu's childhood was marked by the horrors of war, the loss of his home country, the separation from and loss of his mother, the horrific circumstances which he and his family endured escaping Vietnam and living in the refugee camps, and the racial intolerance he endured as an immigrant boy in Richmond after "making it to America." Particularly in light of the demands of his father's work effectively removing him as a guiding parent, the Court can conclude that a "lack of youthful guidance," now permitted under the ***Booker*** mandate is a mitigating factor to consider at sentencing.

168 months is a substantial sentence. It is just punishment. It is a deterrent. It reflects the seriousness of Steve Tieu's criminal conduct, and it will promote respect for the law. It recognizes the role that Steve played in this offense, as well as recognizing his most difficult beginning and the affect that must have had on his development. Finally, it avoids unwarranted disparity from the sentences handed out to similarly situated defendants.

Respectfully submitted,

_____/S/_____
Richard B. Mazer
Attorney for Defendant
CUONG MACH BINH "STEVE" TIEU

DEFENDANT'S SENTENCING
MEMORANDUM [3:11CR00097-001 CRB]                12