1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    MIRANDA KANE (CABN 150630)
3   Chief, Criminal Division

4   AARON D. WEGNER (CABN 243809)
    ROBERT DAVID REES (CABN 229441)
5
       450 Golden Gate Avenue
6      San Francisco, California 94102
       Telephone:  (415) 436-7200
7      Facsimile:  (415) 436-7234

8   Attorneys for the United States

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  UNITED STATES OF AMERICA          )   No. CR 11-0097 CRB
                                      )
14                                    )   UNITED STATES SENTENCING
                                      )   MEMORANDUM
15        v.                          )
                                      )
16  CUONG MACH BINH TIEU              )
                                      )
17                                    )   Date: December 5, 2012
          Defendant.                  )   Time: 2:00 p.m.
18  _____ )   Court: Hon. Charles R. Breyer

19

20

21

22

23

24

25

26

27

28  GOVERNMENT'S SENTENCING MEMORANDUM
    No. CR 11-0097 CRB

# TABLE OF CONTENTS

**BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

      1.     The Methamphetamine Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

      2.     The Ephedrine Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

      3.     Cocaine Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

**LEGAL STANDARD**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

      A.     Guidelines Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

            1.     The Correct Guidelines Calculation Is Level 41. . . . . . . . . . . . . . . . . . -6-

            2.     The Defendant's Criminal History Category Is CHC IV. . . . . . . . . . . . -7-

            3.     The Correct Guidelines Range Is 360 Months to Life In Prison. . . . . . . -8-

      B.     360 Months In Prison Is An Appropriate Sentence Considering The Nature And Circumstances Of The Offense, And The Defendant's History And Characteristics – § 3553(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

            1.     Defendant's Criminal History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

            2.     Confidential Source Reporting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

                   a.     CW2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

                   b.     CW3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

                   c.     CW4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

                   d.     CW5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

      C.     360 Months In Prison Should Deter The Defendant From Further Illegal Activity and Protect the Public from Further Crimes– §3553(a)(2)(B)+(C)). . . . . . . . . -12-

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Avila*, 905 F.2d 295 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Barnes*, 993 F.2d 680 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Maldonado*, 215 F.3d 1046 (9th Cir. 2000). . . . . . . . . . . . . . . . . . .. . . 7

*United States v. Rita*, 127 S. Ct. 2456 (2007). . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 5, 6

## FEDERAL STATUTES

18 U.S.C. § 3553(a). . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

U.S.S.G. §3B1.1.(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

1    On June 19, 2012, the defendant pled guilty without a plea agreement to each of the

2   charges against him in the original Indictment:

3        *Count 1 – Conspiracy to Conduct the Affairs of a Racketeer-Influenced Corrupt

4   Organization

5        *Count 2 – Conducting the Affairs of a Racketeer-Influenced Corrupt Organization

6        *Count 3 – Conspiracy to Possess with Intent to Distribute and Distribute

7   Methamphetamine

8        *Count 4 – Possession with Intent to Distribute and Distribution of Methamphetamine

9        *Count 5 – Conspiracy to Possess and Distribute Ephedrine

10       *Count 6 – Possession and Distribution of Ephedrine

11       *Count 7 – Conspiracy to Manufacture Methamphetamine

12       *Count 8 – Manufacture of Methamphetamine

13       *Count 21– Conspiracy to Possess with Intent to Distribute and Distribute Cocaine

14       *Count 22 – Possession with Intent to Distribute and Distribution of Cocaine

15   On November 21, 2012, the government received the final Presentence Report ("PSR") in

16   this matter.  The PSR calculated the defendant's Guidelines as 360 months - life in prison with a

17   recommendation of 360 months.[1]  The government agrees with the sentencing recommendation

18   contained in the PSR and for the reasons detailed below, the government believes that a sentence

19   of 360 months is reasonable and appropriate in this case.

20                              **BACKGROUND**

21       Beginning in 2007, the DEA began an investigation into a large-scale drug

22   trafficking organization that was transporting large amounts of cocaine to Canada and importing

23   large amounts of MDMA (also know as "ecstasy") from Canada to the Bay Area.  During the

24   investigation, agents discovered that members of the organization were using funds from both

25   Oaks Card Club in Emeryville, California, and Artichoke Joe's Casino in San Bruno, California

26   _____

27       [1]The government agrees with the Guidelines calculation contained in the PSR and the
     conclusion that the defendant is not eligible for the safety valve.

28   GOVERNMENT'S SENTENCING MEMORANDUM
     No. CR 11-0097 CRB              -1-

(collectively referred to as "the casinos") to purchase drugs.  Further investigation revealed that members of the criminal organization had effectively taken over the Asian gaming sections of both casinos and engaged in loansharking openly on the casino floor with the assistance of casino employees.

Early in the investigation, agents identified the defendant as one of the leaders of the criminal organization.  The investigation revealed that the defendant was a poly-drug trafficker who supplied and distributed multi-pound quantities of methamphetamine, kilogram quantities of cocaine, and hundreds of thousands of MDMA pills.  The investigation further revealed that the defendant had access to the cash drawers at both casinos (known as the "kwei tungs") and that he would use those funds to finance illegal activity, primarily drug purchases.  Sources also reported that the defendant regularly received a portion of the profits from the loansharking activity at the casinos. In addition, sources reported that hundreds of people worked for the defendant's criminal organization, and many of these individuals were known to be armed and dangerous.

The investigation revealed that the defendant was a smart and savy criminal.  Given his leadership status within the organization, the defendant rarely directly touched drugs or drug money, but rather had his underlings perform these tasks.  He also had multiple telephones during the investigation and the government's attempts to intercept his criminal conversations were often thwarted.  However, he was not perfect in his attempts to escape law enforcement scrutiny. Through various wiretap interceptions and source reports, agents learned that dozens of members of the organization regularly reported to the defendant regarding the organization's activities. Agents also discovered that members of the organization regularly deferred to the defendant when critical decisions needed to be made.

When the four-year investigation was complete, the government had obtained strong evidence of the defendant's involvement and leadership in the criminal activity charged in this case.  The charges against the defendant can generally be broken down into three separate categories:  1)  the sale of one pound of methamphetamine to a cooperating witness in 2008; and (2) the defendant's purchase of 25 kilograms of ephedrine from cooperating witnesses in 2009

GOVERNMENT'S SENTENCING MEMORANDUM
No. CR 11-0097 CRB                         -2-

1   and his subsequent attempts to convert that ephedrine to methamphetamine and MDMA; 3) the

2   defendant's involvement in a conspiracy to purchase large amounts of cocaine in 2010. Each of

3   these events will be discussed in more detail below.

4        1.    The Methamphetamine Transaction

5        On April 24, 2008, the defendant was intercepted communicating with co-defendant

6   Skyler Chang about obtaining one pound of methamphetamine. The telephone calls demonstrate

7   that the defendant was the source of supply for the one pound of methamphetamine and the

8   defendant's drug courier (referred to as his "nephew") was going to transport it. (Transcript of

9   telephone call dated 4/24/08, Attached as Ex. A.) The drug deal happened that evening at Zesty's

10  Restaurant in San Francisco with the defendant and Chang present. One of the known drug

11  couriers for the defendant delivered the methamphetamine to the vehicle of a government

12  cooperating witness ("CW1"). Another government cooperating witness ("CW2") was present

13  for the deal (he/she was not cooperating at the time) and later confirmed that the defendant was

14  the source of the supply for the one pound of methamphetamine. The total sale price for the one

15  pound of methamphetamine was $20,000. The following day, the defendant was intercepted

16  speaking to Chang about paying his courier for the methamphetamine. Agents observed Chang

17  pay money to one of the defendant's couriers later the same day.

18       2.    The Ephedrine Transaction

19       Between March and May of 2009, CS2 met with Skyler Chang on numerous occasions to

20  discuss the purchase of 25 kilograms of ephedrine. Chang told CW2 that he was purchasing the

21  ephedrine for the defendant, who intended to use the ephedrine to manufacture methamphetamine

22  and MDMA. Based on intercepted telephones calls, agents learned that the defendant took

23  $30,000 from the drawer (also known as the "kwei tung") at Oaks Card Club in order to pay for

24  the ephedrine. (Transcript of telephone call dated 6/30/09, Attached as Exhibit B.) On May 26,

25  2009, Chang deposited $3,500 into an undercover law enforcement account as a deposit for the

26  ephedrine. On June 6, 2009, Chang provided CW2 with a sample of three ecstasy pills, which he

27

28  GOVERNMENT'S SENTENCING MEMORANDUM
    No. CR 11-0097 CRB         -3-

1    stated had been made by the defendant from a ephedrine sample that CW2 had previously

2    provided to Chang.

3            On June 30, 2009, the ephedrine deal took place.  After Chang personally gave an

4    undercover FBI agent $26,500 as payment for the ephedrine in Union City (the initial deposit of

5    $3,500 having already been provided on May 26, 2009), CW2 provided one bucket (containing

6    approximately 8.3 kilograms of ephedrine) to a known drug courier for the defendant (who later

7    became CW3).  Pursuant to the defendant's instructions, CW3 took a sample of the ephedrine

8    (referred to as "sandwiches") to the defendant at Dreams Auto Body in Richmond shortly after

9    obtaining the bucket.  (Transcript of telephone call dated 6/30/09, Attached as Ex. C.)  The

10   government kept possession of the other two buckets in a storage facility in San Mateo.  On July

11   28, 2009, Chang gave CW2 a sample of methamphetamine that was made by the defendant from

12   the ephedrine.

13           On November 9, 2009, the defendant met with Chang and told him to have the two

14   remaining buckets delivered to him at LA Tech Auto Body Shop in Richmond the following day.

15   On November 10, 2009, CW2 delivered the two remaining buckets of ephedrine to LA Tech

16   where CW3 and the defendant took possession of the buckets.

17           3.    Cocaine Conspiracy

18           In the spring of 2010, the defendant used money from Oaks Card Club to purchase large

19   amounts of cocaine from an individual who later became a government cooperating witness

20   "CW4").  The defendant directed CW3 (who was not cooperating at the time) to pick up $24,000

21   in cash from Oaks.  CW3 picked up the money and later, along with the defendant, met with

22   CW4.  At that meeting, the defendant purchased 3/4 of a kilogram of cocaine and paid CW4

23   $11,000, using the money taken from the "kwei tung" at Oaks Card Club.

24           The defendant contacted CW3 later that night and reported that the cocaine was of poor

25   quality.  He instructed CW3 to seek a full refund or a $3,000 discount from CW4 as a result.  The

26   next day, CW3 met with CW4 and they agreed to a $3,000 discount.  During the meeting, CW4

27   said he/she was going to Los Angeles soon and would be coming back with two more kilos of

28   GOVERNMENT'S SENTENCING MEMORANDUM
     No. CR 11-0097 CRB                    -4-

cocaine.  CW4 traveled to Los Angeles and returned with two kilograms of cocaine.  Shortly thereafter, CW4 met with the defendant and CW3.  The defendant purchased one kilogram of cocaine from CW4 for which he paid $12,000 from the cash received at Oaks.  The defendant told CW4 that he would be interested in purchasing up to ten kilograms of cocaine per week from CW4.

Later that day, the defendant called CW3 and instructed him/her to purchase another kilogram of cocaine from CW4.  CW4 later delivered the kilogram of cocaine to the defendant at Dreams Auto Body.  The defendant did not like the quality of the cocaine and later instructed CW3 to return the cocaine to CW4.  However, shortly thereafter, the defendant called CW4 and asked him/her if the one kilogram of cocaine that he had returned was still available.  CW4 told the defendant that he/she did not have that particular kilo, but did have another kilo available.  The defendant picked up that kilogram of cocaine the following day and paid CW4 $15,000.

By the end of March 2010, the defendant informed CW4 that CW3 had been arrested and future dealings with him would not involve CW3, but would instead involve co-defendant Ding Lin.  The defendant, Ding Lin, and CW4 subsequently agreed on a ten kilogram cocaine purchase for $230,000, but the defendant backed out shortly before the deal was complete.

## LEGAL STANDARD

Under Ninth Circuit case law, the Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct guidelines range.  *Carty*, 520 F.3d at 991.

Although the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  *United States v. Rita*, 127 S. Ct. 2456, 2464 (2007).  The guidelines range will be the starting point and the initial benchmark for the sentence.  *Carty*, 520 F.3d at 991.  The Court should keep the guidelines range in mind throughout the

GOVERNMENT'S SENTENCING MEMORANDUM
No. CR 11-0097 CRB                    -5-

1  process, allow the parties to argue for a sentence they believe is appropriate, and consider the

2  factors identified in 18 U.S.C. § 3553(a).  *Id.*

3  If the Court imposes a sentence outside the guidelines range, it should ensure that its

4  justification for deviating from the range is sufficiently compelling to support the degree of

5  variance in the sentence that it imposes.  *Id*.  The Court should make an individualized

6  determination based on the facts of each case.  *Id.*  The Court, however, is not required to raise

7  every possible relevant issue sua sponte.  *Id.*

8  ## ARGUMENT

9  **A.   Guidelines Calculation**

10  1.   The Correct Guidelines Calculation Is Level 41

11  The sentencing guidelines calculation contained in the PSR is correct.  PSR ¶¶ 61-443.

12  Despite his assertion to the contrary, the defendant was a leader of the large-scale criminal

13  enterprise and the four-level enhancement applies in the case.  *See* U.S.S.G. §3B1.1(a).  As an

14  initial matter, the criminal enterprise in this case was far reaching, as demonstrated by the

15  indictment in this case that charged fifteen defendants.  The criminal enterprise consisted of drug

16  dealers, drug couriers, loansharks, and even casino employees.  Therefore, there is overwhelming

17  evidence that the "criminal activity involved five or more people or was otherwise extensive."

18  U.S.S.G. §3B1.1(a).

19  Furthermore, as will be discussed below, there is also overwhelming evidence that the

20  defendant was a leader of the criminal enterprise.  As an initial matter, it is noteworthy that four

21  separate confidential witnesses stated that the defendant was a leader of the criminal enterprise.

22  For example, CW2 reported that the defendant had hundreds of armed "soldiers" who worked for

23  him as guards and drug couriers throughout the United States.  CW5 reported that the defendant

24  was known as "Big Dog" within the organization and that he received a portion of the funds

25  generated by the loansharking activity at the casinos.  In addition to the source reports, the

26  wiretap recordings of the defendant show that he gave direct orders to Skyler Chang, Ding Lin,

27

28  GOVERNMENT'S SENTENCING MEMORANDUM
No. CR 11-0097 CRB                    -6-

1   CW3, and CW5.[2]  The defendant had also admitted that he directly supervised the drug dealing of

2   co-defendant Chea Bou.  In addition, on the night of the one pound methamphetamine deal,

3   surveillance agents observed the defendant arrive at the drug deal with two of his known drug

4   couriers.  At the conclusion of the meeting, the defendant ordered one of the couriers to deliver

5   the one pound of methamphetamine to CW1.  A San Mateo County Narcotics Task Force officer

6   witnessed the defendant's courier leave the restaurant and put the methamphetamine in CW1's

7   car.

8          Thus, the evidence shows that the defendant was truly the "Big Dog" of the organization

9   and routinely gave orders to those working for him. The Ninth Circuit has repeatedly approved

10  the application of a role-adjustment in cases such as the instant case.  *See*, *e.g.*, *United States v.*

11  *Garcia*, 497 F.3d 964, 969 (9th Cir. 2007) (applying four-level upward adjustment because

12  defendant set the prices and exercised control over the methamphetamine by "fronting" it to

13  customers); *United States v. Maldonado*, 215 F.3d 1046 (9th Cir. 2000) (applying role adjustment

14  because defendant negotiated price and provided the drugs to the customers, but used couriers to

15  deliver drugs and retrieve payment); *United States v. Barnes*, 993 F.2d 680, 684-85 (9th Cir.

16  1993) ("While an enhancement under section 3B1.1(a) or (b) is proper only in a criminal activity

17  involving more than five participants, there is no requirement, as [defendant] seems to suggest,

18  that the defendant *exercise authority over* at least five participants before the enhancement can be

19  applied."); *United States v. Avila*, 905 F.2d 295, 298-99 (9th Cir. 1990) (upholding the

20  application of the enhancement because defendant coordinated the procurement and distribution

21  of narcotics and had multiple sources of supply).

22                    2.    The Defendant's Criminal History Category Is CHC IV

23         The government agrees with the Probation Officer's calculation of the defendant's

24  criminal history, resulting in a Criminal History Category of IV.  (PSR ¶ 451).

25  _____

26         [2]For example, the defendant was intercepted on June 30, 2009, directing Ding Lin to

27  "give it" to the Northern Guy (a nickname for co-defendant Bob Yuen).  (Transcript of telephone
    call dated 6/30/09, Attached as Ex. D.)

28  GOVERNMENT'S SENTENCING MEMORANDUM
    No. CR 11-0097 CRB                    -7-

3.     The Correct Guidelines Range Is 360 Months to Life In Prison

The Guidelines Range provided for Offense Level 41 and Criminal History Category IV is 360 months to life in prison.  *See* U.S.S.G., Sentencing Table.  The sentencing range lies in Zone D of the Sentencing Table, and the sentence must therefore be served in prison.  *Id*.

**B.     360 Months In Prison Is An Appropriate Sentence Considering The Nature And Circumstances Of The Offense, And The Defendant's History And Characteristics – § 3553(a)(1)**

1.     Defendant's Criminal History

There is no question that the amounts of methamphetamine, cocaine, and ephedrine involved in the current offenses are large and that the defendant was involved at a high-level in obtaining the drugs.  However, the defendant is much more than just a high-level drug trafficker.  As shown by his criminal history, he is a violent person who has consistently shown no respect for the law.  The defendant's criminal history began at the age of 18 when he was convicted of second degree murder following a jury trial in Fresno.[3]  (Fresno Police report dated 7/16/88, Attached as Ex. E.)  Simply stated, the defendant committed cold-blooded murder.

After his release from custody, the defendant was convicted of Reckless Driving in 2005.  In 2008, he was convicting of violating the Endangered Species Act in federal court and received a sentence of three years of probation and ten months home confinement.  While on federal probation for that offense, he committed the majority of the crimes charged in this case.  While the defendant has previously argued that this probation violation is insignificant because it was merely a misdemeanor conviction, this misses the point.  While on probation, the defendant had the opportunity to put his criminal past behind him and lead a honest and law-abiding life.  But he did just the opposite; he engaged in narcotics trafficking while leading a large-scale criminal organization.  The defendant's crimes while on federal probation prove that the defendant will not

---

[3]The defendant's habeas proceedings ultimately resulted in a guilty plea to voluntary manslaughter, but it is telling that the defendant received a sentence of <u>eleven years</u> as a result of the voluntary manslaughter conviction.  This lengthy sentence speaks volumes about the heinous and senseless nature of the killing.

1    conform his conduct to comply with the laws of the United States and further establish that he is a

2    danger to the community.

3         In addition to the crimes charged in this case, the defendant's brazen disrespect for the law

4    is demonstrated by his attempt to help two murder suspects flee the country in 2009.   According

5    to DEA reports that were produced in discovery, CW2 reported that the defendant had asked

6    Skyler Chang to see whether CW2 could obtain false documents for the murder suspects.   CW2

7    reported that Chang stated that the defendant had spent over a week trying to help the suspects get

8    out of the country.   In addition to the information from the DEA reports, the defendant also

9    admitted in his post-arrest interview in this case that he met with one of the suspects shortly after

10   the murder.   Wiretap interceptions from that time period show that the defendant helped plan the

11   suspect's "going away" dinner.   The murder suspect was eventually arrested during the "going

12   away" dinner and, not surprisingly, the defendant was also present at the dinner.

13                         2.    Confidential Source Reporting

14        While the defendant's criminal history is telling of his "history and characteristics," the

15   most illuminating evidence comes from those individuals who committed crimes with him.

16                         a.    CW2

17        While CW2 worked primarily for Skyler Chang, he also met with the defendant on

18   numerous occasions and provided his associates, including CW3, with hundreds of thousands of

19   ecstasy pills.   CW2 also reported that the defendant was able to access money from the "kwei

20   tung" at Artichoke Joe's and this money was used to fund large-scale drug purchases, including

21   $98,500 that was seized from CW2 in September of 2007.   CW2 stated that he/she was hesitant to

22   cooperate with the government because he/she feared retaliation from the defendant and his

23   associates, who he/she knew to be armed and dangerous.   CW2 stated that hundreds of "soldiers"

24   worked for the defendant as body guards and/or drug couriers.[4]

25   _____

26        [4]This assertion is corroborated by statements from another government cooperating
     witness ("CW6") who stated that the defendant was the leader of a large group of gangsters.

27   CW6 stated that the defendant was responsible for the drug trafficking aspect of the organization

28   GOVERNMENT'S SENTENCING MEMORANDUM
     No. CR 11-0097 CRB              -9-

When CW2 was arrested in possession of 300,000 MDMA pills, he/she stated that 100,000 of those pills were supposed to be delivered to the defendant. CW2 stated that in addition to the MDMA pills he/she delivered to the defendant, he/she believed that the defendant also had his own source of supply for MDMA pills in Toronto, Canada. According to CW2, in addition to the pills he had delivered to the Bay Area, the defendant would also have pills delivered directly to Houston, Texas. CW2 also believed that the defendant had his own pill press machine for manufacturing MDMA pills.

> b.     CW3

CW3 worked as a drug courier for the defendant for several years before his/her arrest in 2010. During a search of CW3's home, agents discovered 13,000 MDMA pills, a quarter kilogram of cocaine, and firearms. After he/she began cooperating, CW3 admitted that the drugs discovered during the search belonged to the defendant and one of the firearms was given to him/her by the defendant. While cooperating, CW3 met with the defendant to discuss the debt owed as a result of the drug seizure. During one of the meetings, the defendant very clearly explains that he is upset with CW3 for the failure to fully pay back the debt. (Transcript from 4/20/10 meeting, Attached as Ex. F.)

CW3 stated that during the years he/she worked for the defendant, they met on almost a daily basis. As a result, CW3 is very familiar with the defendant's drug trafficking activity. CW3 stated that the majority of his/her work for the defendant involved transporting and selling cocaine, MDMA, and marijuana. For example, prior to 2007, CW3 sold approximately 5,000 to 6,000 MDMA pills a week for the defendant. In 2007, CW3 stated that he transported multi-kilograms of cocaine for the defendant approximately twice a month for about five months. In 2009, CW3 picked up approximately 25,000 MDMA pills on behalf of the defendant. CW3 also stated that he picked up the ephedrine on behalf of the defendant on June 30, 2009, and took possession of the remainder of the ephedrine along with the defendant on November 10, 2009.

---

as well as the "muscle." CW6 further stated that if someone needed to be beat up or murdered, the defendant was responsible for making that happen through his gang connections.

The defendant also provided directions to CW3 regarding the delivery of the ephedrine to other individuals. CW3 recalled that the defendant told him/her that he wanted to make ecstasy or methamphetamine. The defendant also asked CW3 if he/she wanted to learn how to cook the drugs and also find a place to rent for the manufacturing of the drugs.

CW3 also recalled traveling to Los Angeles at the direction of the defendant on five occasions for the purpose of picking up cocaine. CW3 recalled that one occasion he drove a Porsche and met with one of the defendant's associates in Orange County who installed a trap compartment in the vehicle. CW3 stated that Ding Lin accompanied him on one of the trips to Los Angeles and noted that Lin was also a drug and money courier for the defendant.

c.      CW4

CW4 began buying cocaine from the defendant in 2001 and 2003. Between 2002-2004, Ding Lin delivered approximately three ounces of cocaine monthly to CW4 on behalf of the defendant. After Lin went to jail in 2004, CW3 delivered the cocaine to CW4 on behalf of the defendant.

In early 2009, CW4 called the CW3 and asked if the defendant was interested in buying cocaine. As detailed above, the defendant and CW3 began purchasing large amounts of cocaine from CW4 in the spring of 2010. However, after CW3 was arrested, the defendant told CW4 not to deal with CW3 anymore and only deal with Ding Lin. (Surveillance photographs of meeting between CW4, Steve Tieu and Ding Lin on 4/1/10, Attached as Ex. G.) During one of the cocaine transactions, the defendant asked CW4 if CW4's cocaine source of supply was interested in obtaining ephedrine. Around the same time, the defendant also provided CW4 with two ephedrine samples. CW4 transported both samples to Los Angeles but no sale of the ephedrine was completed.

///

///

///

GOVERNMENT'S SENTENCING MEMORANDUM
No. CR 11-0097 CRB                                -11-

Around the same time,  the defendant asked CW4 to research methods used to produce methamphetamine.  During a later meeting, CW4 provided the defendant with various documents that discussed procedures to manufacture methamphetamine.[5]

                  d.      CW5

CW5 identified the defendant as the leader of "the company" and stated that the defendant was known as "Big Dog."  CW5 knew that the defendant received a cut of the loansharking profits from both casinos.  CW5 personally delivered envelopes containing loansharking profits from Oaks to the defendant.  CW5 recalled giving money to the defendant at Oaks on at least 30 occasions.  CW5 stated that the defendant laundered his drug profits by receiving checks from an auto body shop in exchange for cash.  CW5 also recalled helping move pills presses from one location to another on behalf on the organization.

**C.  360 Months In Prison Should Deter The Defendant From Further Illegal Activity and Protect the Public from Further Crimes– §3553(a)(2)(B)+(C))**

The government has shown by overwhelming evidence that the defendant is a ruthless criminal who has no interest in living a law-abiding life.  The defendant is a convicted murder who was sentenced to 11 years in prison for killing a man in cold blood.  Despite that sentence, the defendant continued to engage in a life of crime and became the leader of a large-scale criminal enterprise involved in drug dealing and loansharking.  The record shows that the defendant is a menace to the public in general.  While 360 months is a lengthy sentence and should only be imposed in rare cases, the government has shown that the defendant presents such a case.  By imposing a Guidelines sentence, the Court will send a message to address the seriousness of this offense, promote respect for the law, provide just punishment, and deter the defendant from future criminal conduct.

///

///

---

[5] These documents were produced in discovery.

GOVERNMENT'S SENTENCING MEMORANDUM
No. CR 11-0097 CRB          -12-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Based on the foregoing, the Government recommends a sentence of a term of imprisonment of 360 months; five years of supervised release (with conditions to be fixed by the Court); and a $1000 special assessment.


DATED: November 28, 2012

Respectfully submitted,

MELINDA HAAG
United States Attorney


_____/s/_____
AARON D. WEGNER
ROBERT DAVID REES
Assistant United States Attorneys
