Coung Mach Binh Tieu
Reg. No. 91019-111
P.O. Box 800
Herlong, CA 96113

*FILED*

2015 OCT 13 P 4: 50

SUSAN Y. SOONG
CLERK US DISTRICT COURT
NO. DIST. OF CA.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CUONG MACH BINH TIEU, | : MOTION UNDER 18 U.S.C.§3582 (c)(2) |
| MOVANT, | : |
| | : |
| VS. | : CRIM. NO. 3-11-CR-97-CRB |
| | : |
| UNITED STATES OF AMERICA, | : CIVIL NO. _____ |
| RESPONDENT. | |

---

Comes now Cuong Mach Binh Tieu, Movant (hereinafter Tieu), and asks the court for a sentence reduction in light of the United States Sentencing Commission's ruling Amendment 782 applies retroactively effective November 1, 2015. This motion is based on the following:

First, Tieu is without funds to perfect this motion, and he asks the court to liberally construe this pleading.

### A.   STATEMENT OF JURISDICTION

1. Title 18 U.S.C. §3582 (c)(2) provides in relevant part:

> In the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has been lowered by the Sentencing Commission pursuant to 28 U.S.C. §8994 (o) upon motion of the defendant... the Court may reduce the term of imprisonment, after considering the factors set forth in 18 U.S.C. §3553 (a) to the extent they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

### II.   APPLICABLE SENTENCING COMMISSION POLICY STATEMENT(S)

In 1991, the Supreme Court gave the Sentencing Commission the authority to decide whether and to what extent its amendments that

reduce sentences are to be given retroactive effect. See <u>Braxton</u>
<u>v. United States</u>, 114 L.Ed.2d 385, 111 S.Ct. 1854, 1858 (1991),
and <u>United States v. Coohey</u>, 11 F.3d 97, (8th Cir. 1993).

Section 1B1.10. Reduction In Term of Imprisonment as a Result
of Amended Guideline Range (Policy Statement) in part reads:

**(1)** In General.--In a case in which a defendant is
serving a term of imprisonment, and the guideline
range applicable to that defendant has subsequently
been lowered as a result of an amendment to the
Guidelines Manual listed in subsection (d) below,
the court may reduce the defendant's term of
imprisonment as provided by 18 U.S.C. §3582 (C)(2).
As required by 18 U.S.C. §3582 (C)(2), any such
reduction in the defendant's term of imprisonment
shall be consistent with this policy statement.

Subsection (d) Covered Amendments-Amendments covered by this
policy statement are listed in Appendix C follows:

In so far as only amendment "782" is relevant to this pleading,
only that amendment is referenced: "782 (subject to subsection (e)(1)".

Subsection (e)(1) reads:

(e) Special Instructions.--

(1) This court shall not order a reduced term of
imprisonment base on Amendment 782 unless the
effective date of the court's order is November
1, 2015 or later.

III.                    **THE INDICTMENT**

On or about July 5, 2012 a 48 count indictment was filed in the
Northern District of California charging multiple defendants in some
26 Racketeering Acts with violating 18 U.S.C. §1962 (d)-Conspiracy
to conduct the affairs of a Racketeering Influenced Corrupt
Organization, and with violating 18 U.S.C. §1962 (c)-Conducting the
Affairs of a Racketeering Corrupt Organization.

MOTION UNDER §3582 page 2

IV.              **FACTS GERMANE TO THIS MOTION**

Specifically, Tieu was charged as follows:

**Count    1:** Charged Conspiracy to Conduct the Affairs of a Racketeering Influenced Corrupt Organization in violation of 18 U.S.C. §1962 (d).

**Count    2:** Charged Conducting the Affairs of a Racketeering Corrupt Organization in violation of 18 U.S.C. §1962 (c).

**Count   3:** (21 U.S.C. §846: Conspiracy to Violate the Controlled Substances Act)
    Between in or about February 2008 and in or April 2008, within the Northern District of California,

                CUONG MACH BINH TIEU,
                SKYLER CHANG,

and others known and unknown to the Grand Jury, knowingly and intentionally conspired to possess with intent to distribute and to distribute a controlled substance, namely 50 grams or more of methamphetamine, its salts, and salts of its isomers, and did aid and abet the same, in violation of 21 U.S.C. §§846, 841 (a)(1), and 18 U.S.C. §2.

**Count  4:** (21 U.S.C. §841 (a)(1): Possession with Intent to Distribute and Distribution of a Controlled Substance)
    Between in or about February 2008 and in or about April 2008, within the Northern District of California,

                CUONG MACH BINH TIEU,
                SKYLER CHANG,

and others known and unknown to the Grand Jury, knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, and did aid and abet the same, in violation of 21 U.S.C. §841 Ua)(1) and 18 U.S.C. §2.

**Count    5:** (21 U.S.C. §846: Conspiracy to Violate the Controlled Substances Act)
    Between in or about March 2009 and in or about November 2009, in the Northern District of California,

                CUONG MACH BINH TIEU,
                SKYLER CHANG,

DING LIN,

and others known and unknown to the Grand Jury,
knowingly and intentionally conspired unlawfully
to possess and distribute a listed chemical, namely
ephedrine, knowingly and having reasonable cause
to believe that the listed chemical would be used
to manufacture a controlled substance, namely
methamphetamine, its salts, isomers, and salts of
its isomers, and did aid and abet the same, in
violation of 21 U.S.C. §§846, 841 (c)(2), and 18
U.S.C. §2.

Count   6: 21 U.S.C. §841 (c)(2): Possession and
distribution of Listed Chemical to Manufacture a
Controlled Substance)
    Between in or about March 2009 and in or about
November 2009, in the Northern District of
California,

CUONG MACH BINH TIEU,
SKYLER CHANG,
DING LIN,

and others known and unknown to the Grand Jury,
knowingly, and intentionally, and unlawfully
possessed and distributed a listed chemical, namely
ephedrine, knowing and having reasonable cause to
believe that the listed chemical would be used to
manufacture a controlled substance, namely
methamphetamine, its salts, isomers, and salts of
its isomers, and did aid and abet the same, in
violation of 21 U.S.C. §841 (c)(2) and 18 U.S.C.
§2.

Count   7: (21 U.S.C. §846: Conspiracy to Violate
the Controlled Substances Act)
    Between in or about March 2009 and in or about
November 2009, in the Northern District of
California,

CUON MACH BINH TIEU,
SKYLER CHANG,
DING LIN,

and others known and unknown to the Grand Jury,
knowingly and intentionally conspired to
manufacture a controlled substance, namely 50 grams
or more of methamphetamine, its salts, isomers, and
salts of its isomers, and did aid and abet the
same, in violation of 21 U.S.C. §§846, 841 (a)(1),
and 18 U.S.C. §2.

Count   8: (21 U.S.C. §841 (a)(1): Manufacture
of a controlled Substance)
    Between in or about March 2009 and in or about

November 2009, in the Northern District of California,

**CUONG MACH BINH TIEU,**
**SKYLER CHANG,**
**DING LIN,**

and other known and unknown to the Grand Jury, knowingly and intentionally manufactured a controlled substance, namely methamphetamine, its salts, isomers, and salts of its isomers, and did aid and abet the same, in violation of 21 U.S.C. §841 (a)(1) and 18 U.S.C. §2.

Count 21: (21 U.S.C. §846: Conspiracy to Violate the Controlled Substances Act)
    Between in or about February 2010, within the Northern District of California,

**CUONG MACH BINH TIEU**

and other known and unknown to the Grand Jury knowingly and intentionally conspired to possess with intent to distribute and to distribute a controlled substance, namely 5 kilograms or more of cocaine, and did aid and abet the same, in violation of 21 U.S.C. §§846, 841 (a)(1), and 18 U.S.C. §2.

Count 22: (21 U.S.C. §841 (a)(1): Possession with Intent to Distribute and Distribution of a Controlled Substance)
    Between in or about February 2010 and in or about April 2010, within the Northern District of California,

**CUONG MACH BINH TIEU**

and others known and unknown to the Grand Jury knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely 500 grams or more of cocaine, and did aid and abet the same, in violation of 21 U.S.C. §841 (a)(1) and 18 U.S.C. §2.

A review of the ten (10) counts, and the PSR, show that Tieu's sentence to 210 months confinement was predicated on his alleged involvement with drugs. He was charged, plead guilty, and sentenced for this charged activity.

      **A.**      **THE PRESENTENCE INVESTIGATIVE REPORT**

First, the PSR at pages 14, 15, 16, 17, and 18 (<u>Exh. A-14, 15,
16, 17, and 18</u>) under Racketeering Acts set forth eight Acts alleging
Tieu's and others involvement in both the Conspiracy to Violate §1962
(d) and the substantive offense charged under §1962 (c). But the
evidence adduced and admitted to by Tieu during the charge of Plea
Hearing; supports involvement in the "drug" facet of the alleged
RICO enterprise, not the loan sharking activity.

1.        <u>THE EIGHT RACKETEERING ACTS</u>

66. <u>Racketeering Act 1</u>:  Conspiracy to Possess with
Intent to Distribute and Distribution of 50 Grams
or More of Methamphetamine, 21 U.S.C. §§846, 841
(a)(1).

73. <u>Racketeering Act 2</u>:  'Conspiracy to Posess
with  Intent  to  Distribute  and  Distribution  of
Methamphetamine and Ephedrine, 21 U.S.C. §§846, 841
(a)(1).

80. <u>Racketeering Act 3</u>:  Possess with Intent to
Distribute and Distribution of MDMA, 21 U.S.C. §841
(a)(1).

94. <u>Racketeering Act 5</u>:  Conspiracy to Possess
with Intent to Distribute and Distribution of MDMA,
21 U.S.C. §§846, 841 (a)(1).

108. <u>Racketeering Act 7</u>:  Conspiracy to Possess
with Intent to Distribute and Distribution of MDMA,
21 U.S.C. §§846, 841 (a)(1).

115. <u>Racketeering Act 8</u>:  Conspiracy to Possess
with Intent to Distribute and Distribution of MDMA,
21 U.S.C. §§846, 841 (a)(1).

150. <u>Racketeering Act 13</u>:  Conspiracy to Possess
with Intent to Distribute and Distribution of MDMA,
21 U.S.C. §§846, 841 (a)(1).

A cursory review of the eight Racketeering Acts establish
Tieu's activity as charged in the indictment clearly was drug related
Racketeering Acts one (1), two (2), five (5), seven (7), eight
(8), ten (10), and thirteen (13) were conspiracies. Racketeering Act
three (3) Possession with intent to distribute and distribution of

MOTION UNDER §3582 page 6

MDMA. Also a substance noted at Racketeering Act 18 p. 19 PSR BZP

was set forth with no drug amount – possession with intent to

distribute.

    2.                     **DRUG TYPE/QUANTITY**

        a.                **METHAMPHETAMINE**

The PSR at p. 13 of 58 reads in pertinent part:

> "There are no laboratory testing results regarding
> the methamphetamine associated with this conduct.
> Charging documents provide for 200 grams of
> methamphetamine (Actual). Therefore, this amount
> will be used for guideline purposes..." Exh. B.

        b.                **EPHEDRINE**

Page 14 of 58 of the PSR reads in part:

> "... there are no laboratory testing results
> regarding the cocaine associated with this conduct,
> therefore, this amount, as provided in charging
> documents, will be used for guideline purposes...".
> Exh. C.

        c.                **COCAINE**

Page 15 of 58 parag. 56 in significant part reads:

> "... there are no laboratory testing results
> regarding the cocaine associated with the conduct;
> therfore, this amount, will be used for guideline
> purposes...". Exh. D.

Tieu is cognizant of the fact that all findings regarding drug

type and quantity cannot be relitigated under 18 U.S.C. §3582 (c)(2)

in determining drug amount for purposes of this motion in light

of retroactive Amendment 782. But it has historical significance.

    3.               **MULTIPLE COUNT ADJUSTMENT**

Here under count one the conspiracy under 18 U.S.C. §1962 (d)

the drug type and quantity were properly converted to there marijuana

equivalent resulting in 255,000 kilograms of marijuana at a BOL of

38 with 4 points for leadership equals 42, and two points for increase

in offense level a BOL of 44 under multiple count adjustment (U.S.S.G. §3D1.4).

     a.         **ACCEPTANCE OF RESPONSIBILITY**

Under U.S.S.G. §3E1.1 (a) and (b) Tieu's BOL of 44 was decreased by 3 points for a final BOL of 41.

     B.         **TIEU'S SENTENCING**

The Court in fashioning a sentence for Tieu took into consideration the fact Tieu came into the court room and plead guilty; he did not have the benefit of a presentence report, and he should receive truely favorable consideration for those facts alone. So he should get a sentence that reflects some variance from the sentencing guideline. See Exh. E-28 (0054) Sen. Tran. Lines: 2/5.

     B.         **PROGRAM REVIEW**

Tieu has been involved in ongoing skills development and college level educational classes. For example, Tieu satisfactorily completed:

    1. Core Power. See Exh.

    2. 12 Hour Drug Education Class

    3. Anger Management (Pending Certificate).

    4. Parenting (Pending Certificate).

     1.         **COLLEGE CLASSES**

    1. Basic Writing. Exhs. I and J.

    2. Basic Mathematics. Exh. I and J.

    3. Pre Algebra. Exhs. I and J.

    4. Success in College. Exh. I and J.

    5. Aid Appreciation. Exh. I and J.

     2.         **CURRENT COLLEGE CLASSES**

    1. History - Pre Civil War. Exh. I

    2. Introduction to Sociology Exh. I

C.                    **RELEASE PLANS**

Currently, Tieu's release date is set for _____ . But he nonetheless provides the following information regarding his residence and employer.

Tieu will reside at 118 Agate Way Hercules, California 94547, and he will be employed as a body and fender man at LA Tech 2311 Rheem Ave. Richmond, California 94806, and at Dream Auto 720 San Pablo Ave. Pinole, California

V.               **AMENDMENT 782'S IMPACT**
                 **ON TIEU'S SENTENCE**
                 **(DISCUSSION)**

First, the Court downward departed and set Tieu's BOL at 37 with a sentencing range of 292 months to 365, with a criminal history of IV (4). See Exh. F-p. 3 (0029) Sen. Tran.

At page 28 Exh. E lines 1 to 8 Sentencing Transcripts, the Court, as noted above (Exh. E), varied from the guidelines and imposed a 220 month concurrent sentences on Tieu. This translated into a BOL of 34 and a U.S.S.G. range of 210-262 months.

Second, it is Tieu's position that the Court varying from the guidelines does not preclude Tieu from being eligible for the two (2) point reduction under retroactive Amendment 782.

Here Tieu asks the Court in the exercise of its plenary power to except BOL 34 in that under the guidelines it comports with the Court's variance and imposition of a 220 month prison term on Tieu and in exercising its discretion in light of 782's two point reduction reset Tieu's BOL at 32 with an amended guideline sentencing range of 168-210 months at a criminal history of IV (4), and in sentencing him at the low end of the amended range impose a 168 month term of incarceration on Tieu.

### IN CONCLUSION

**WHEREFORE** Cuong Binh Tieu prays that based on the foregoing the Court will issue an Order reducing his sentence in light of Amendment 782 to a BOL 32 and the low end of the amended guideline range of 168-210 to: 168 months, or any other relief this Court deems just and proper.

Respectfully signed and submitted this *30* day of September 2015.

_____
Cuong Binh Tieu

### CERTIFICATE OF MAILING

I, Cuong Binh Tieu, swear under penalty of perjury that I handed to F.C.I. prison officials to mail to the below listed parties in my behalf postage pre paid first class on September *30* , 2015 the hereto attached motion under 18 U.S.C. §3582 (c)(2).

Assistant U.S. Attorney
1301 CLAY STREET Ste. 340-S
OAKLAND CA 94612-5217

U.S. District Court
Attn: Clerk's Office
450 Golden Gate Ave.
San Francisco, CA 94102

Signed: _____
Cuong Binh Tieu

Ephedrine has the equivalency of 250,000 kilograms of marijuana, for a total of
250,400 kilograms.  Pursuant to USSG §2D1.1(c)(1), 30,000 kilograms or more
of marijuana has a base offense level of 38.                                    **38**

| Drug Name | Drug Quantity | Marihuana Equivalency |
|-----------|---------------|----------------------|
| Methamphetamine | 200.0 g | 400.0 kg |
| Ephedrine | 25.0 kg | 250000.0 kg |
| Total | | 250400.0 kg |

75.  Specific Offense Characteristics:  None.                                  **0**

76.  Victim Related Adjustment:                                               **0**

77.  Adjustment for Role in the Offense: The defendant was an organizer or leader
     of a criminal activity that involved five or more participants or was otherwise
     extensive; therefore, four levels are added. USSG §3B1.1(a).             **+4**

78.  Adjustment for Obstruction of Justice: None.                            **0**

79.  Adjusted Offense Level (Subtotal): None.                               **42**

80.  Racketeering Act 3: Possess with Intent to Distribute and Distribution of MDMA, 21
     U.S.C. § 841(a)(1)

81.  Base Offense Level: The guideline for a violation of 21 U.S.C. § 841(a)(1) is
     found at the Drug Quantity Tables found at USSG §2D1.1(c). There is no listed
     quantity for the MDMA.  According to USSG §2D1.1, comment. (n.10(D)), the
     minimum offense level is 12.                                            **12**

82.  Specific Offense Characteristics:  None.                                 **0**

83.  Victim Related Adjustment: None.                                        **0**

84.  Adjustment for Role in the Offense: The defendant was an organizer or leader
     of a criminal activity that involved five or more participants or was otherwise
     extensive; therefore, four levels are added. USSG §3B1.1(a).            **+4**

85.  Adjustment for Obstruction of Justice: None.                            **0**

86.  Adjusted Offense Level (Subtotal):                                      **16**

87.  Racketeering Act 4: Extortionate Extension of Credit ($5,000 loan on November 14,
     2009)

88.  Base Offense Level: The guideline for 18 U.S.C. § 892(a) offenses is found in
     USSG §2E2.1(a) of the guidelines, and provides for a base offense level 20.  **20**

14

Exh. A-18 of 58

89.   Specific Offense Characteristics:  None.                                            0

90.   Victim Related Adjustment: None.                                                   0

91.   Adjustment for Role in the Offense: The defendant was an organizer or leader
      of a criminal activity that involved five or more participants or was otherwise
      extensive; therefore, four levels are added. USSG §3B1.1(a).                       +4

92.   Adjustment for Obstruction of Justice: None.                                       0

93.   Adjusted Offense Level (Subtotal):                                                 24

94.   Racketeering Act 5: Conspiracy to Possess with Intent to Distribute and Distribution of
      MDMA, 21 U.S.C. §§ 846, 841(a)(1)

95.   Base Offense Level: The guideline for a violation of 21 U.S.C. § 846 is found at
      the Drug Quantity Tables found at USSG §2D1.1(c). There is no listed quantity
      for the MDMA.  According to USSG §2D1.1, comment. (n.10(D)), the minimum
      offense level is 12.                                                               12

96.   Specific Offense Characteristics:  None.                                           0

97.   Victim Related Adjustment: None.                                                   0

98.   Adjustment for Role in the Offense: The defendant was an organizer or leader
      of a criminal activity that involved five or more participants or was otherwise
      extensive; therefore, four levels are added. USSG §3B1.1(a).                       +4

99.   Adjustment for Obstruction of Justice: None.                                       0

100.  Adjusted Offense Level (Subtotal):                                                 16

101.  Racketeering Act 6: Extortionate Extension of Credit ($10,000 loan on October 20, 2009)

102.  Base Offense Level: The guideline for 18 U.S.C. § 892(a) offenses is found in
      USSG §2E2.1(a) of the guidelines, and provides for a base offense level 20.        20

103.  Specific Offense Characteristics:  None.                                           0

104.  Victim Related Adjustment: None.                                                   0

105.  Adjustment for Role in the Offense: The defendant was an organizer or leader
      of a criminal activity that involved five or more participants or was otherwise
      extensive; therefore, four levels are added. USSG §3B1.1(a).                       +4

106.  Adjustment for Obstruction of Justice: None.                                       0

107.  Adjusted Offense Level (Subtotal):                                                 24

108.  Racketeering Act 7: Conspiracy to Possess with Intent to Distribute and Distribution of
      MDMA, 21 U.S.C. §§ 846, 841(a)(1)

15

Exh. A-19 P 58

109. **Base Offense Level:** The guideline for a violation of 21 U.S.C. § 846 is found at the Drug Quantity Tables found at USSG §2D1.1(c). There is no listed quantity for the MDMA. According to USSG §2D1.1, comment. (n.10(D)), the minimum offense level is 12.                                                                    **12**

110. **Specific Offense Characteristics:** None.                                                   **0**

111. **Victim Related Adjustment:** None.                                                          **0**

112. **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a).                              **+4**

113. **Adjustment for Obstruction of Justice:** None.                                              **0**

114. **Adjusted Offense Level (Subtotal):**                                                        **16**

115. **Racketeering Act 8:** Conspiracy to Possess with Intent to Distribute and Distribution of MDMA, 21 U.S.C. §§ 846, 841(a)(1)

116. **Base Offense Level:** The guideline for a violation of 21 U.S.C. § 846 is found at the Drug Quantity Tables found at USSG §2D1.1(c). There is no listed quantity for the MDMA. According to USSG §2D1.1, comment. (n.10(D)), the minimum offense level is 12.                                                                    **12**

117. **Specific Offense Characteristics:** None.                                                   **0**

118. **Victim Related Adjustment:** None.                                                          **0**

119. **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a).                              **+4**

120. **Adjustment for Obstruction of Justice:** None.                                              **0**

121. **Adjusted Offense Level (Subtotal):**                                                        **16**

122. **Racketeering Act 9:** Extortionate Extension of Credit ($5,000 loan on January 14, 2010)

123. **Base Offense Level:** The guideline for 18 U.S.C. § 892(a) offenses is found in USSG §2E2.1(a) of the guidelines, and provides for a base offense level 20.        **20**

124. **Specific Offense Characteristics:** None.                                                   **0**

125. **Victim Related Adjustment:** None.                                                          **0**

126. **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a).                              **+4**

127. **Adjustment for Obstruction of Justice:** None.                                              **0**

16

Exh. A-20 of 58

148.   Adjustment for Obstruction of Justice: None.                              <u>0</u>

149.   Adjusted Offense Level (Subtotal):                                        <u>24</u>

150.   <u>Racketeering Act 13</u>: Conspiracy to Possess with Intent to Distribute and Distribution of
       MDMA, 21 U.S.C. §§ 846, 841(a)(1)

151.   Base Offense Level: The guideline for a violation of 21 U.S.C. § 846 is found at
       the Drug Quantity Tables found at USSG §2D1.1(c). There is no listed quantity
       for the MDMA. According to USSG §2D1.1, comment. (n.10(D)), the minimum
       offense level is 12.                                                      12

152.   Specific Offense Characteristics: None.                                   0

153.   Victim Related Adjustment: None.                                          0

154.   Adjustment for Role in the Offense: The defendant was an organizer or leader
       of a criminal activity that involved five or more participants or was otherwise
       extensive; therefore, four levels are added. USSG §3B1.1(a).              +4

155.   Adjustment for Obstruction of Justice: None.                              0

156.   Adjusted Offense Level (Subtotal):                                        16

157.   <u>Racketeering Act 14</u>: Extortionate Extension of Credit ($3,000 loan on April 29, 2010)

158.   Base Offense Level: The guideline for 18 U.S.C. § 892(a) offenses is found in
       USSG §2E2.1(a) of the guidelines, and provides for a base offense level 20.   20

159.   Specific Offense Characteristics: None.                                   0

160.   Victim Related Adjustment: None.                                          0

161.   Adjustment for Role in the Offense: The defendant was an organizer or leader
       of a criminal activity that involved five or more participants or was otherwise
       extensive; therefore, four levels are added. USSG §3B1.1(a).              +4

162.   Adjustment for Obstruction of Justice: None.                              0

163.   Adjusted Offense Level (Subtotal):                                        24

164.   <u>Racketeering Act 15</u>: Extortionate Extension of Credit ($5,000 loan on May 13, 2010)

165.   Base Offense Level: The guideline for 18 U.S.C. § 892(a) offenses is found in
       USSG §2E2.1(a) of the guidelines, and provides for a base offense level 20.   20

166.   Specific Offense Characteristics: None.                                   0

167.   Victim Related Adjustment: None.                                          0

18

Exh. A 22/58

31.   THANH THE CHU worked with the enterprise at Oaks Card Club collecting illegal debts. He was employed by the casino as a floorman.

32.   KWAI PING WONG was a loanshark at Artichoke Joe's Casino. He was employed by the casino as a floorman.

33.   JOHN HIN YU CHEW worked with the enterprise at Artichoke Joe's Casino extending and collecting extortionate and illegal debts. He was employed by the casino as a floorman.

34.   BAO TRAN was a loanshark at Artichoke Joe's Casino. He was employed by the casino as a tile dealer.

35.   Regarding Cuong Mach Bin Tieu, the undersigned officer was provided discovery material that details the defendant's involvement in drug possession and distribution, primarily on three discrete narcotics transactions: (1) the sale of one pound of methamphetamine by Chang and Tieu to a cooperating witness in 2008; (2) Tieu's and Chang's purchase of 25 kilograms of ephedrine from cooperating witnesses in 2009 and their subsequent attempts to convert that ephedrine to methamphetamine; and (3) Tieu's charge in Counts Twenty One and Twenty Two with narcotics violations related to his role in a cocaine distribution conspiracy. Other members of the enterprise engaged in loansharking at the casinos, but Tieu is not believed to have played a major role in those activities. However, as a high level member of the enterprise, there is evidence that Tieu received a cut of the profits from the loansharking activity.

The Methamphetamine Transaction

36.   On February 6, 2008, cooperating witnesses (CW-1 and CW-2) went to Artichoke Joe's to meet with Chang and obtain a sample of methamphetamine to conduct a purity sample of the drug. At this point, CW-1 was cooperating with the government, but CW-2 was not. No sample of methamphetamine was obtained at that time, but Chang later interacted with CW-1 and CW-2 on February 7, 2008, when a methamphetamine sample was tested and found to be of poor quality. Chang left with the sample. On February 21, 2008, CW-2 obtained additional methamphetamine at Artichoke Joe's at Chang's direction.

37.   A couple months later, on April 22, 2008, Chang gave yet another methamphetamine sample to CW-2. By this point, a wiretap intercept was active on Chang's phone. Two days later, CW-1 set up a deal with CW-2 involving Chang for the purchase of one pound of methamphetamine. Chang communicated with Tieu about obtaining the methamphetamine. The deal eventually happened at Zesty's Restaurant (San Francisco) that evening while Tieu, Chang, CW-1, and CW-2, and others were present. A Tieu associate gave the methamphetamine to CW-1 in the parking lot of Zesty's while the others were inside.

38.   On April 25, 2008, CW-1 paid Chang $18,500 for the methamphetamine. A number of recorded phone calls, including intercepts on Chang's phone corroborate the deal, along with surveillance, including photographs of Chang receiving the money.

39.   The next month, CW-1 met with Chang to discuss a second purchase of methamphetamine. Chang agreed and asked if CW-1 wanted two pounds instead. Chang

8

Exh.B-8

11/21/2012 01:56:33 PM          NDCA ->

also inquired about kilo prices for cocaine, and said "they" can move up to 100 kilograms of cocaine.

40.   Approximately a week later, Chang called Tieu asking if an associate could meet Chang at Artichoke Joe's to conduct this second methamphetamine transaction. Chang received a call from the associate and Chang asked the associate to bring the "ticket" (methamphetamine) to Artichoke Joe's. After some delay the associate told Chang that "the stuff wasn't worth the money." Chang called Tieu and told Tieu "the girls weren't pretty," and the deal never occurred.

41.   There are no laboratory testing results regarding the methamphetamine associated with this conduct. Charging documents provide for 200 grams of methamphetamine (actual). Therefore, this amount will be used for guideline purposes. It appears that the defendant acted as a manager or supervisor in this drug conspiracy that included five or more people, in that he supervised and/or directed drug activity that involved codefendants Lin and Chang, and several confidential witnesses.

### The Ephedrine Transaction

42.   On January 9, 2008, Chang discussed with CW-2 his plan to import methamphetamine precursors into the United States from China. Chang suggested using Motorcycle Madness (San Bruno, California) to import drug precursors in the parts. Chang flew to China on January 10, 2008, to look into the issue. This particular scheme never came to fruition.

43.   On March 11, 2009, Chang met with CW-2 (who by this point was cooperating with the government) and an undercover agent at Houston's restaurant (San Francisco) to discuss the purchase and delivery of ephedrine to Chang on behalf of Tieu. When asked what the ephedrine was for, Chang pointed to a glass with ice cubes in it and tapped it, signaling "ice," the street name for methamphetamine. The discussion moved from using the undercover agent to transport precursors to having the undercover agent provide and transport the precursors himself. This conversation was recorded.

44.   On April 23, 2009, Chang met with CW-2 who provided Chang with a 5 gram sample of ephedrine. Chang would not take the sample and said someone else would take it, but that never happened. On April 24, 2009, CW-2 met with Chang again to deliver the 5 gram sample of ephedrine. This time Chang accepted it. During this contact, Chang informed CW-2 that if CW-2 ever cooperated with the government against Chang, Chang would never stop looking for CW-2's family. While there was surveillance of the meeting, the audio recording malfunctioned.

45.   On May 13, 2009, CW-2 met Chang to discuss Tieu's payment for the ephedrine. On May 26, 2009, Chang deposited $3,500 into an undercover account as a deposit for 25 kilos of ephedrine, which was video recorded.

46.   After additional discussion of the deal, on June 6, 2009, Chang provided CW-2 with a sample of three Ecstasy pills. Chang said that Tieu had made the Ecstasy sample with the ephedrine sample provided on April 24, 2009. On June 24, 2009, CW-2 had a conversation with Chang where Chang said that Tieu took $30,000 from Oaks Card Club to pay for the 25 kilos of ephedrine.

9


Exh. B-9

47. On June 30, 2009, the deal to deliver three buckets containing approximately 8.3 kilos each of ephedrine actually occurred. Chang gave an undercover agent $26,500 as payment for the ephedrine in Union City, California (the initial deposit of $3,500 having already been provided on May 26, 2009). A cooperating witness (CW-3, who at this point was not cooperating with the government) showed up on a motorcycle and took one bucket to an address in Hayward, California and later traveled to Dreams Auto Body (Pinole, California) to drop off a sample to Tieu. The government kept possession of the other two buckets in a storage facility in San Mateo, California until Tieu and his crew indicated that they were ready for them. GPS tracker devices built into the bucket indicated where it went. The next day, July 1, 2009, CW-2 met with Chang to discuss events of the prior day, which included a lengthy discussion about the delivery of the ephedrine along with Chang indicating that the money to pay for it came from a cash drawer at Oaks.

48. By July 20, 2009, it was becoming clear that Tieu and his associates were having trouble converting the ephedrine into methamphetamine. That day, CW-2 met with Chang who described problems with the chef cooking the methamphetamine and plans to possibly trade the ephedrine for cocaine instead.

49. Efforts to convert the ephedrine to methamphetamine did not cease, however. On July 28, 2009, Chang gave CW-2 a sample of methamphetamine that was made from the ephedrine. Chang advised that the reason everything was taking so long was that Tieu had to keep an eye on the chef and needed to get another cook. Some additional conversations relating to troubles converting the ephedrine to methamphetamine occurred thereafter. Tieu also contacted CW-4 (who was not then working with the government) for some advice about how to convert ephedrine to methamphetamine.

50. By November 2009, CW-2 was informed that Tieu was prepared to take delivery of the second and third buckets of ephedrine that he had purchased in late June. Surveilling agents observed Tieu and Chang meeting with each other at an unnamed restaurant. On November 10, 2009, the operation went forward. CW-2 met with Chang who instructed CW-2 to deliver the buckets to Tieu at LA Tech auto body shop (Richmond, California) before 5:00PM. CW-2 delivered the two remaining buckets of ephedrine there in Tieu's presence, although Tieu and CW-2 did not actually speak. CW-3 delivered the two buckets from the auto body shop to an associate of Tieu's in a McDonald's parking lot on Ocean Avenue (San Francisco). GPS tracker data from the buckets showed them going to vicinity of the McDonald's. The ephedrine was never recovered.

51. There are no laboratory testing results regarding the ephedrine associated with this conduct. Therefore, 25 kilograms will be used for guidelines purposes. It appears that the defendant acted as a manager or supervisor in this drug conspiracy that included five or more people, in that he supervised and/or directed drug activity that involved codefendants Lin and Chang, and several confidential witnesses.

**The Cocaine Conspiracy**

52. In February 2010, Tieu asked CW-3 to pick up $24,000 in cash from Oaks. Tieu said the money was for the purchase of 36 ounces of cocaine from one individual, but CW-3 suggested that he purchase the cocaine instead from CW-4 (at this point, neither CW-3

10


Exh. C-10

nor CW-4 were working with the government). Tieu agreed and the two went to CW-4's office where CW-4 indicated that there was 3/4 of a kilogram of cocaine available for sale. Tieu said the quality appeared poor, but CW-3 purchased it from CW-4 anyway for $11,000 using the money received from Oaks at Tieu's direction.

53.  Tieu contacted CW-3 later that night to report that the cocaine was indeed of very poor quality. He instructed CW-3 to seek a full refund or a $3,000 discount from CW-4 as a result. The next day, CW-3 met with CW-4 and CW-4 agreed to the $3,000 discount. CW-4 said he was going to Los Angeles (where the source was) soon and would be coming back with two more kilos of cocaine. CW-3 believed that Tieu would be interested in purchasing it. A few days later, CW-4 returned with the 2 kilos of interest and Tieu and CW-3 met with CW-4 in CW-4's office again. Tieu believed the new cocaine to be of higher quality and purchased a kilo CW-3 took home at Tieu's direction. CW-3 paid $12,000 for the cocaine from the cash received from Oaks (which, when the $3,000 credit was factored in, came up to a total purchase price of $15,000). Tieu and CW-3 told CW-4 that they would be interested in up to 10 kilograms per week if CW-4 could secure that much. Later at home, CW-3 divided up the kilo into four separately packaged quarter kilos. Tieu instructed CW-3 to deliver one quarter to a person in San Jose, California known as "the DMV guy" and another quarter to a woman he knew as "sister."

54.  Later that day, Tieu called CW-3 to say that they would go ahead and purchase another kilo and to tell CW-4 to deliver it to Dreams Auto Body Shop. CW-4 did indeed deliver one kilo of cocaine to Tieu at Dreams Auto Body (Pinole, California). Tieu was less impressed with the quality of that kilo of cocaine, and instructed CW-3 to pick it up from him and return it to CW-4, which CW-3 did. Agents later recovered the two quarter kilos of separately packaged cocaine that had not been distributed from CW-3.

55.  Around the same time, Tieu called CW-4 personally and asked if CW-4 still had the one kilo of cocaine that Tieu had returned. CW-4 said that particular kilo was unavailable, but another kilo was available. Tieu came by that day and picked up the kilo. The next day, Tieu paid CW-4 $15,000 in $100 bills for the cocaine. By the end of March 2010, Tieu informed CW-4 not to work with CW-3 anymore. Later, Tieu, an associate, and CW-4 agreed on a 10 kilogram cocaine purchase for $230,000, but Tieu backed out at the last minute.

56.  In total, Tieu is responsible for 5 kilograms of cocaine. There are no laboratory testing results regarding the cocaine associated with this conduct; therefore, this amount, as provided in charging documents, will be used for guideline purposes. It appears that the defendant acted as a manager or supervisor in this drug conspiracy that included five or more people, in that he supervised and/or directed drug activity that involved codefendants Lin and Chang, and several confidential witnesses.

57.  There is no information available regarding the illegal loans involving the defendant. He did not provide any further information.

**Victim Impact**

58.  This is a Title 21 offense and there is no identifiable victim.

11



1   to 365, and the government's recommendation is 360.  I think a

2   sentence should be below that amount.  I think, for a number

3   of considerations, and especially the fact that he did come

4   in, did plead guilty, did not have the benefit of a

5   presentence report, and should receive favorable

6   consideration, truly favorable consideration for those facts,

7   those facts alone.  So he should get a sentence that reflects

8   some variance from the sentencing guidelines.

9        It should be greater than Skyler Chang's sentence, in

10  my view.  I don't know that there's a particular magic to a

11  number.  Nevertheless, I note that he's 42 years of age.  That

12  he will forfeit his ability to grow up with his children.  He

13  will forfeit his ability to be with his father, who's played

14  an enormously significant role in his life.  And whatever

15  sentence I give to him, the punishment will reflect the fact

16  that he has been removed from society, one, for the protection

17  of society; two, for the punishment that he deserves; and

18  three, that the cost to him from a personal point of view will

19  be reflected by the fact that he has essentially been severed

20  from his family connections.  And I take all that into account

21  in determining the appropriate sentence.

22       Accordingly, pursuant to the Sentencing Reform Act of

23  1984, it is the judgment of the Court that Cuong Mach, Binh

24  Tieu, also known as Steve, Hak Se Wui, Ah Keung, is hereby

25  commit it to custody of the Bureau of Prisons to be imprisoned

1   There are objections to the manner in which the sentencing

2   guideline total offense level is calculated.  The bottom line

3   on the objections is that it is the defendant's contention

4   that the appropriate adjusted offense level is 37 as distinct

5   from 41.  The guideline range is 292 months to 365 months.

6           That's where we stand.  I have reviewed the objections.

7   Is there anything that anybody wishes to say in addition to

8   what was said?

9           MR. WEGNER:  Submitted on that point, your Honor.

10          THE COURT:  Okay.  So I'm going to sustain the

11  defendant's objections with the following changes:  Paragraph

12  70, which -- Paragraph 70 of the presentence report that has a

13  four-point adjustment should be zero.  Paragraph 72, which, as

14  a result of the Paragraph 70, would instead of being 38, would

15  be 34.  Paragraph 77, which has a four-point adjustment,

16  should be a two-point adjustment.  And therefore Paragraph 79,

17  which is 42, would then be 40.  Paragraph 133, which is a

18  four-point adjustment, should be a two-point adjustment.

19  Paragraph 135, which is 36, should be 34.

20          I am going to group the drug racketeering acts, all the

21  drug racketeering acts as a -- grouped together, and therefore

22  they would be consolidated with respect to Paragraphs 73

23  through 79.  Accordingly, the adjusted offense level would be

24  37; with a guideline range of 292 months to 365 months.

25          Those are the findings with respect to the sentencing

# CERTIFICATE OF ACHIEVEMENT

## FCI HERLONG RECREATION DEPARTMENT

### This Certifies That

# TIEU

Has successfully completed the following class

## Core Power

This certificate is hereby issued January, 5th 2014

R. Carruth
R. Carruth, Supervisor of Recreation

G. Votaw
G. Votaw, Sports Specialist

Exh. G

# CUONG TIEU

**91019-111**

**Has Successfully Completed**

## 12 Hour Drug Education Class

**FCI Herlong, California**

**December 31, 2013**

D. Rodriquez, Drug Treatment Specialist

Exh. H

```
                        *          INMATE EDUCATION DATA         *      09-24-2015
PAGE 001 OF 001 *                      TRANSCRIPT               *      11:08:51

REGISTER NO: 91019-111      NAME..: TIEU                      FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: HER-HERLONG FCI

------------------------- EDUCATION INFORMATION -------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
HER  ESL HAS     ENGLISH PROFICIENT      02-20-2013 0855 CURRENT
HER  GED HAS     COMPLETED GED OR HS DIPLOMA  03-09-2013 1223 CURRENT


------------------------- EDUCATION COURSES -------------------------
SUB-FACL   DESCRIPTION                  START DATE  STOP DATE EVNT AC LV  HRS
HER        HIST16-PRE CIVIL WAR-LCC     08-17-2015 CURRENT
HER        INTRO TO SOC-LCC             08-17-2015 CURRENT
HER        ACE NUTRITION & MEALS (RPP 1) 08-29-2015 08-29-2015  P  C  P    2
HER        ART APPRECIATION-LCC         01-08-2015 05-22-2015  C  C  P    0
HER        COUNSELING GUIDANCE-LCC      01-08-2015 05-22-2015  C  C  P    0
HER        NATL FED PERSONAL TRNG       01-18-2015 03-28-2015  P  C  P   30
HER        MATH 102-LCC                 08-18-2014 12-19-2014  C  C  P    0
HER        MATH 101-LCC                 01-13-2014 05-23-2014  C  C  P    0
HER        BASIC WRITING-LCC            01-13-2014 05-23-2014  C  C  P    0










G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

Exh. I

# LASSEN COLLEGE
## S U S A N V I L L E

LCC
LASSEN COMMUNITY COLLEGE

06/22/15                    Official Transcript                    Page 1 of 1

Name:      Cuong M.B Tieu 91019-111                    SSN: XXX-XX-0276
ID Number: 1108878                                     Birth Date: 12/31/69

| CSU GE CAN | Description | Course & Number | Units Att | Units Comp | Grade | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| | | * * * 2014 SPRING * * * | | | | | |
| | Basic Writing | ENGL 102 | 3.0 | 3.0 | B | 9.0 | |
| | Basic Mathematics | MATH 101 | 2.0 | 2.0 | A | 8.0 | |
| | Success in College | CG 1 | < 3.0> | 0.0 | W | 0.0 | |
| | | | 5.0 | 5.0 | | 17.0 | 3.400 |
| | Cumulative Total: | | 5.0 | 5.0 | | 17.0 | 3.400 |
| | | * * * 2014 FALL * * * | | | | | |
| | Pre-Algebra | MATH 102 | 2.0 | 2.0 | B | 6.0 | |
| | | | 2.0 | 2.0 | | 6.0 | 3.000 |
| | Cumulative Total: | | 7.0 | 7.0 | | 23.0 | 3.286 |
| | | * * * 2015 SPRING * * * | | | | | |
| | Success in College | CG 1 | 3.0 | 3.0 | A | 12.0 | |
| C1 | Art Appreciation | ART 8 | 3.0 | 3.0 | A | 12.0 | |
| | | | 6.0 | 6.0 | | 24.0 | 4.000 |
| | Cumulative Total: | | 13.0 | 13.0 | | 47.0 | 3.615 |
| | Vice Presidential Honors | | | | | | |
| | L.C.C.D. Cumulative totals: | | 13.0 | 13.0 | | 47.0 | 3.615 |
| | Degree Applicable totals: | | 6.0 | 6.0 | | 24.0 | 4.000 |

Academic Standing:
* Vice Presidential Honors

Exh. J

P. O. Box 3000, 478-200 Hwy 139, Susanville, CA 96130-3000     530-257-6181     Records: 530-251-8808     Fax: 530-251-8802

# Certificate of Completion

The Education Department of FCI Herlong

Certifies that

## Cuong Tieu

Has successfully completed the following 2 hour Adult Continuing Education course:

### Nutrition and Meal Planning

This certificate is issued the 29th of August 2015

J. Anderson
_____
**J. Anderson**
A.C.E Coordinator

Mrs. Lynn
_____
**Mrs. Lynn**
Supervisor of Education